NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 20, 2022

S22A0548. JONES v. THE STATE.

LaGrua, Justice.

Appellant Carl Lamont Jones was convicted of felony murder and other crimes in connection with the April 7, 2015 shooting death of John Lee Jones. On appeal, Appellant contends that the trial court erred in denying his motion to suppress certain evidence collected from his back yard; that the trial court abused its discretion in failing to properly question and remove a juror who disclosed mid-trial that she went to school with one of the witnesses; that the trial court erred by refusing to permit Appellant to cross-examine a witness about her pending criminal charge; and that Appellant is entitled to a new trial due to the cumulative effect of multiple errors at trial under *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020).[1]  For

_____

[1] In November 2017, Appellant was indicted by a Richmond County

the reasons that follow, we affirm Appellant's convictions.

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed that on the night of April 7, 2015, Appellant and his girlfriend, Jamila Rena Allen, drove to the Dogwood Terrace apartment complex in Augusta in Allen's white Chevrolet Suburban for Appellant to look for his missing cell phone. When they arrived, Appellant parked the car in front of the

grand jury, together with co-indictee Jamila Rena Allen, on charges of malice murder, felony murder, possession of a firearm during the commission of a crime, three counts of criminal damage to property in the second degree, and possession of a firearm by a convicted felon. In June 2018, a jury found Appellant guilty of all counts except malice murder and one count of criminal damage to property in the second degree. Upon the motion of the State, the trial court nolle prossed the possession of a firearm by a convicted felon charge. The trial court sentenced Appellant to serve life in prison without the possibility of parole, plus an additional 15 years. On July 12, 2018, Appellant filed a timely motion for new trial through trial counsel, but under the wrong case number. On August 20, 2018, Appellant filed a motion for out-of-time motion for new trial through appellate counsel. On September 28, 2018, the trial court issued an order on Appellant's motion for out-of-time motion for new trial, concluding that Appellant had actually filed a timely motion for new trial under the wrong case number, so the court would apply the correct case number for "preservation of [Appellant's] right to appeal and right to a motion for new trial hearing" and ordered that all filings in the other case number be incorporated into the correct case. Appellant refiled his motion for new trial under the correct case number through appellate counsel on October 9, 2018, which he amended on March 12, 2021. Following an evidentiary hearing, the trial court denied Appellant's motion for new trial on August 31, 2021. Appellant filed a timely notice of appeal to this Court on September 7, 2021. The case was docketed to this Court's term beginning in April 2022.

apartment complex and got out of the vehicle, but Allen stayed in the front passenger seat and played games on her phone.

Shiesha Thurman and Renee Young were standing outside the apartment complex that night, and they observed Appellant and Allen drive up in a "white long car." Thurman testified that Appellant walked over in front of the apartments and started "flipping out about a cell phone," asking "where the F his stuff was and somebody better come up with his stuff." Thurman and Young then watched as Appellant got a shotgun from inside the Suburban and started "shooting crazy." Young dropped to the ground. Thurman overheard the victim John Lee Jones ("John Lee"), who was standing nearby, tell Appellant that "nobody didn't have his phone," but Appellant still kept shooting "every way." John Lee was struck during the shooting. According to Thurman, "the buckshots caught him, and it was too late before he could duck to miss the buckshots." Several vehicles parked along the roadway were also struck, including Young's 2010 Mazda 5.

After the shooting, Appellant jumped back into the Suburban

3

with Allen and told her to drive off because "they were shooting."[2]

Allen testified that she panicked and drove directly to the house she shared with Appellant and her children located at 3419 Chadbourne Street. Appellant left the residence soon afterwards in Allen's Suburban, but Allen did not know where he went.[3]

Shortly before midnight, officers with the Richmond County Sheriff's Office arrived at the Dogwood Terrace apartment complex and learned that John Lee had been transported by a private vehicle to the hospital, where he later died from his injuries.[4]  Officers located three shotgun shells in the fire lane in front of the apartment complex, and they also observed several parked cars that had been struck by buckshot.  The firearms examiner testified that the three shotgun shells were fired from the same firearm, a 12-gauge shotgun.  He also testified that the buckshot pellets he obtained from

---

[2] Young and Thurman testified that, other than Appellant, they did not see anyone else with a gun in the area that night.

[3] Allen testified that Appellant did not return to the residence, and she later picked up her vehicle in a nearby neighborhood.  The shotgun was never recovered.

[4] The medical examiner testified that John Lee died from injuries caused by buckshot, which entered his body through the right side of his back.

the medical examiner were consistent with lead buckshot from a shotgun.

That night, Investigator Shea Yates spoke to Thurman and Young separately in an apartment located close to the scene, and the women gave separate accounts of what occurred and provided descriptions of the shooter. Based on their descriptions, Investigator Yates went back to the station and put together a photo lineup of six men. He then returned to Dogwood Terrace and showed the lineup to Thurman and Young individually. Both women selected Appellant's picture from the lineup as the man who shot John Lee earlier that night. The women also identified Appellant as the shooter at trial.

Based on Thurman's and Young's identifications, Investigator Yates obtained an arrest warrant for Appellant on April 8 at 3:35 a.m. After conducting a database search for Appellant's current residential address and obtaining the motor vehicle registration for Allen's Suburban, Investigator Yates learned that Appellant resided with Allen at 3419 Chadbourne Street. At 6:23 a.m., Investigator

5

Yates and other officers went to 3419 Chadbourne Street to look for Appellant. According to Investigator Yates, the officers first attempted to get an answer at the front door, but no one responded. The officers then went around to the back of the house through a low, gated chain link fence. The officers did not get an answer when they knocked on the back door of the house.

Investigator Yates testified that as the officers went around to the back door of the residence, they noticed a shotgun shell laying in the grass in the back yard. The officers photographed the shotgun shell and then sealed it into evidence packaging to be turned over to the GBI for processing.[5] When the firearms examiner later compared the shotgun shell from the back yard of 3419 Chadbourne Street to the shells found at the scene of the shooting, he determined that they were fired from the same 12-gauge shotgun.

Around 8:00 p.m. on April 8, Allen spoke by telephone to officers with the Richmond County Sheriff's Office, and she gave

---

[5] As will be discussed later in this opinion, Appellant filed a motion to suppress this evidence prior to trial.

them permission to search 3419 Chadbourne Street that evening. At the time, Allen did not tell the officers that she was with Appellant the previous night at the Dogwood Terrace apartment complex.[6] The officers did not locate Appellant during their subsequent search of the residence.

Over the next few months, officers continued searching for Appellant, including obtaining search warrants for his cell phone records, following leads from confidential informants, and using the assistance of neighboring sheriff's offices. After receiving a tip as to Appellant's whereabouts, officers located Appellant on July 2, 2015, at an abandoned house in the Richmond Hill area, where he was arrested and taken into custody.

2. On appeal, Appellant contends that the trial court erred in denying his motion to suppress the shotgun shell the officers collected from the back yard of 3419 Chadbourne Street because,

___

[6] Allen was also indicted for the crimes arising from the shooting. Prior to trial, she pleaded guilty to one count of hindering the apprehension of a criminal and two counts of criminal damage to property, testifying at trial that she "shouldn't have had nothing" because she "didn't do nothing wrong."

7

among other reasons, the officers did not have a search warrant authorizing them to seize the shotgun shell or any other object from the enclosed back yard of the residence, and the requirements of the plain-view exception to the warrant requirement of the Fourth Amendment of the United States Constitution have not been met.

On the first morning of trial, June 26, 2018, the trial court held a hearing on Appellant's motion to suppress, and the State presented the testimony of Investigator Yates. Following the hearing, the trial court orally denied Appellant's motion in open court, concluding that—based on the testimony and arguments presented—the State met its burden of proof. However, the record does not include a written order reflecting the trial court's express findings of fact and conclusions of law.

Following Appellant's convictions, Appellant filed a motion for new trial, asserting, among other contentions, that the trial court erred in denying his motion to suppress. The judge who heard Appellant's motion for new trial concluded that the trial court did not err in allowing the shotgun shell into evidence because the arrest

warrant authorized the officers to enter the back yard of Appellant's residence and "to collect the evidence they discovered in plain view while attempting to execute this arrest warrant."

"[T]he manner in which we review a ruling on a motion to suppress" is as follows:

> First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.

*Douglas v. State*, 303 Ga. 178, 181 (2) (811 SE2d 337) (2018) (citations and punctuation omitted). See also *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015) ("When the facts material to a motion to suppress are disputed, it generally is for the trial judge to resolve those disputes and determine the material facts."). However, "[t]he trial court is not required to make express findings of fact after a hearing on a motion to suppress," and where the trial

9

court has not done so, "we nevertheless construe the evidence most favorably to uphold the trial court's judgment." *State v. Brogan*, 340 Ga. App. 232, 234 (797 SE2d 149) (2017). In so construing the evidence, this Court can consider the pretrial testimony adduced at the suppression hearing, as well as the trial transcript. See *White v. State*, 263 Ga. 94, 98 (5) (428 SE2d 789) (1993). See also *Sanders v. State*, 235 Ga. 425, 432 (219 SE2d 768) (1975) (holding that, in considering a defendant's motion to suppress, consideration will be given to the testimony presented at the motions hearing as supplemented by the trial transcript).

Considering both the transcript of the hearing on Appellant's motion to suppress and the trial transcript, we see no error in the trial court's denial of Appellant's motion. There is undisputed evidence in the record—in the form of Investigator Yates's testimony at the motions hearing and at trial regarding his initial investigation into the shooting death of John Lee, the arrest warrant he obtained for Appellant, and the officers' attempts to execute the arrest warrant at the Chadbourne Street residence—to support a

finding that, on April 8, 2015, Appellant resided at 3419 Chadbourne Street and the officers went to this residence with an arrest warrant for Appellant, intending to take him into custody.

We conclude that, because the officers had a lawful arrest warrant for Appellant, they were permitted to enter the property where Appellant resided—including the back yard of the residence—to execute the arrest warrant. "An arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within," and this authority includes the right to enter the back yard or the woods behind the suspect's residence. *Brannan v. State*, 275 Ga. 70, 73 (2) (b) (561 SE2d 414) (2002) (quoting *Payton v. New York*, 445 U.S. 573, 603 (IV) (100 SCt 1371, 63 LE2d 639) (1980)). See also *Geiger v. State*, 295 Ga. 190, 192 (2) (758 SE2d 808) (2014) (holding that because the arresting officers had obtained a warrant for appellant's arrest and he was living at his mother's home, the arrest warrant authorized the officers' entry onto the mother's property to make the arrest).

11

Nevertheless, the undisputed evidence also demonstrates that, at the time the officers went to execute the arrest warrant, they did not have a search warrant for Appellant's residence. "The Fourth Amendment [to the United States Constitution] proscribes all unreasonable searches and seizures, and searches conducted without prior judicial approval are per se unreasonable under the Fourth Amendment, subject to specifically established and well-delineated exceptions." *Teal v. State*, 282 Ga. 319, 322-323 (2) (647 SE2d 15) (2007). One such exception is the plain-view exception. See *George v. State*, 312 Ga. 801, 804-805 (865 SE2d 127) (2021) (citing *Horton v. California*, 496 U.S. 128, 136-137 (II) (110 SCt 2301, 110 LE2d 112) (1990)). In *Horton*, the United States Supreme Court established the plain-view exception to the Fourth Amendment's warrant requirement and explained that "an essential predicate to any valid warrantless seizure of incriminating evidence" is that "not only must the item be in plain view," but also "its incriminating character must also be immediately apparent" and the officer "must have a lawful right of access to the object

12

itself." *Horton*, 496 U.S. at 136-137 (II).

In applying the plain-view exception established in *Horton*, this Court "similarly outlined the requirements for the seizure of evidence" under that exception as follows:

> For evidence to be admissible under that doctrine,[7] the officer collecting the evidence must not have violated the Fourth Amendment in arriving at the place from which he or she sees the evidence. Moreover, the incriminating nature of the object must be immediately apparent. This requirement means that the officer must have probable cause to believe that the item in question is evidence of a crime or is contraband.

*George*, 312 Ga. at 805 (citations and punctuation omitted). Additionally, "[f]or the plain[-]view exception to apply, the item in question must be clearly visible, and the officer may not manipulate or disturb it in order to acquire probable cause to believe the item is evidence of a crime." Id.

With these considerations in mind, we conclude that the trial court did not err when it determined that the shotgun shell was admissible under the plain view doctrine. The evidence shows that,

---

[7] This Court has used both "plain-view exception" and "plain view doctrine."

13

when the officers entered the 3419 Chadbourne Street property to execute the warrant for Appellant's arrest—which we concluded they were legally authorized to do—they first approached the front door, and after getting no response, they went around to the back door. Investigator Yates testified that, as the officers walked towards the back door through the back yard, they observed a shotgun shell laying in the grass. The shotgun shell's incriminating value was immediately apparent to the officers because (1) a shotgun was used to shoot and kill the victim; (2) several vehicles at the scene of the shooting were struck by buckshot from a shotgun; (3) three empty shotgun shells from a 12-gauge shotgun had been located in the street next to the scene of the shooting; and (4) officers were attempting to arrest Appellant for this shooting.

We therefore conclude, after "constru[ing] the evidence most favorably to the upholding of the trial court's findings and judgment," *Douglas*, 303 Ga. at 181 (2), that the trial court did not err in denying Appellant's motion to suppress and allowing this evidence to be admitted at trial.

3. Appellant next contends that the trial court abused its discretion by not properly questioning and/or removing a juror, who disclosed mid-trial that she went to high school with Thurman. We disagree.

On the first day of trial, Thurman testified on behalf of the State, and at the close of her testimony, court adjourned for the day. The next morning, the trial court advised the parties that Juror Number 10 had disclosed to the court that when Thurman testified, the juror realized she went to high school with Thurman. According to the juror, she recognized Thurman's face even though she had not previously recognized her name.

The State acknowledged that, when the potential jurors were questioned during jury selection,[8] the jurors were asked whether any of them knew Thurman, to which Juror Number 10 did not respond. However, the State asserted that this failure to respond was understandable because "when people see people it brings back some memories." The State then asked if the parties could voir dire

_____

[8] Jury selection was not transcribed by a court reporter in this case.

15

Juror Number 10 on this issue "to see if it would affect her opinion or anything." The trial court asked defense counsel what he wanted to do, and defense counsel opposed any questioning of the juror, stating:

> The problem is we've already started the evidence in this case and I mean if we had to—I mean had to ask questions in the way that we normally do in voir dire to handle a situation like this I'm afraid that she may get the impression that we're prying into her business. And I mean at this point we specifically asked whether or not anyone knew Ms. Thurman. I understand maybe it was by accident but that being the case we're concerned that if she knows the witness and she's a primary— one of the two ID witnesses in this case that we would be concerned of her to fairly apprise the case. And so we would ask respectfully that she be removed for cause. And we did everything that we could to find this out beforehand but now that we're finding this out we're asking for that remedy. Because I think for her to judge this case based on previous knowledge of this witness, who is a key witness in this case, I think it would do irreparable harm. And we wouldn't even know how it irreparably harmed us because obviously what goes on in the deliberation room we don't know what is said.

The trial court asked the parties whether the revelation that Juror Number 10 went to school with Thurman was "contrary to what was inquired of the jurors during voir dire." Defense counsel

replied, "[T]he fact that she went to school and she knows her I think is an affirmative response that would have—should have elicited an affirmative response when we were asking those questions." Defense counsel further asserted that if he had known that Juror Number 10 knew Thurman,

> I believe that we would have used one of our strikes. We had strikes available still left that we did not use all of our strikes. And we would have likely used one of our strikes to strike her from the jury because she knew one of the primary witnesses in this case that's against my client.

The State responded that Juror Number 10's oversight was not unreasonable because often people "don't know names they just know faces." The State noted, however, that if the court wanted to dismiss the juror for precautionary reasons, the State would leave it to "the discretion of the court." The trial court ruled that it would not excuse Juror Number 10.

In the order denying Appellant's motion for new trial, the motion-for-new-trial court observed that, to establish that the trial court erred in refusing to excuse a juror for cause, a defendant must

show either actual juror partiality or circumstances inherently prejudicial to the defendant's right to an impartial jury, citing *Moore v. State*, 239 Ga. App. 552, 553 (521 SE2d 467) (1999). The motion-for-new-trial court explained that,

> [w]hile it may have been the preferable approach for the trial judge to interview this juror to inquire as to whether that relationship may have impacted her ability to serve as an impartial juror, that is not the test here. The test is whether there is any indication in the record to support the conclusion that this juror held an unfair bias against the defendant or in favor of the prosecution.

Finding no such support in the record, the motion-for-new-trial court concluded that it was proper not to excuse Juror Number 10 and denied Appellant's motion for new trial on this ground.

On appeal, Appellant argues that the trial court abused its discretion by not conducting a hearing or further inquiring into whether Juror Number 10 could be fair and impartial or whether her relationship with Thurman would influence her decision-making process. Appellant also argues that Juror Number 10 should have been removed for cause when Appellant requested her dismissal.

The State responds that the trial court had no reason to question Juror Number 10 because, after the trial court announced mid-trial that the juror had disclosed she went to high school with Thurman, the State requested a voir dire examination of the juror, but Appellant opposed questioning of the juror and asked to remove her for cause, waiving the issue on appeal. The State also responds that Appellant failed to establish any prejudice or present any evidence to show that this juror held an improper bias or fixed opinion as to Appellant's guilt and that Appellant can only speculate that Juror Number 10's acquaintance with Thurman was so prejudicial that it contributed to his conviction and made his trial fundamentally unfair.

"OCGA § 15-12-172 vests the trial court with broad discretion to replace a juror with an alternate at any point during the proceedings where, among other reasons, it is shown that the juror is unable to perform his or her duty or legal cause exists." *Morrell v. State*, 313 Ga. 247, 263 (3) (869 SE2d 447) (2022). "Whether to strike a juror for cause lies within the sound discretion of the trial

19

judge, and the trial court's exercise of that discretion will not be set aside absent a manifest abuse of discretion." *Collins v. State*, 308 Ga. 608, 612 (3) (842 SE2d 811) (2020).

> To excuse for cause a selected juror in a criminal case on the statutory ground that her ability to be fair and impartial is substantially impaired, a challenger must show that the juror holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will not be able to set it aside and decide the case on the evidence or the court's charge on the evidence. This test is the same as that for prospective jurors: a potential juror is not disqualified as a matter of law when he or she expresses doubt about his or her own impartiality or reservations about his or her ability to put aside personal experiences.

*Morrell*, 313 Ga. at 263 (3) (citations and punctuation omitted).

In this case, although Juror Number 10 disclosed to the trial court that she recognized Thurman during her trial testimony and realized that they went to high school together, there is nothing in the record to support a conclusion that, as a result of this realization, Juror Number 10 held an unfair bias against Appellant or in favor of the prosecution—in fact, Appellant refused to even question this juror regarding any such impartiality. Because the record is devoid

of any evidence to indicate this juror held "a fixed opinion about Appellant's guilt or innocence" or was "unable to decide the case based upon the evidence presented at trial and the trial court's instructions," the trial court did not abuse its discretion in refusing to remove Juror Number 10. *Morrell*, 313 Ga. at 264 (3).

Additionally, we conclude that, by stating he did not want Juror Number 10 to be questioned, Appellant affirmatively waived his claim that the trial court erred by not questioning this juror. See *Woodard v. State*, 296 Ga. 803, 809 (3) (a) (771 SE2d 362) (2015) (holding that, where the defendant did not object to a jury instruction and indeed requested that the trial court give the instruction in question, the defendant "affirmatively waived" any claim of alleged error by the trial court in giving the jury instruction).

4. Appellant also contends that the trial court violated Appellant's right to cross-examine witnesses about potential bias when the trial court refused to allow him to ask Thurman about her pending criminal charge at trial. See *Sanders v. State*, 290 Ga. 445,

446 (2) (721 SE2d 834) (2012) (holding that "the Confrontation Clause of the Sixth Amendment [to the United States Constitution] permits a defendant in a criminal case to cross-examine witnesses about" pending criminal charges "to show bias," but "[t]he Sixth Amendment right of confrontation is not absolute, and trial courts retain broad discretion to impose reasonable limits on cross-examination to avoid harassment, prejudice, confusion, repetition, or irrelevant evidence"). We conclude that any error in limiting Appellant's cross-examination of Thurman was harmless in light of the substantial evidence admitted against Appellant at trial.

During Appellant's cross-examination of Thurman at trial, Appellant asked the trial court for permission to question Thurman about a misdemeanor charge for pointing a gun at another person that was pending against her in the State Court of Richmond County. Appellant argued that, while the charge was not a conviction, this line of questioning was permissible because it went to show Thurman's potential bias. Appellant did not indicate that any plea offer was pending and did not present any other evidence

22

to demonstrate that Thurman had any reason to cooperate with the prosecution.

In response, the State argued, among other things, that the charge was irrelevant because it happened in 2018—several years after the incident at issue. The trial court ruled that it would not allow this line of questioning by Appellant.

In denying Appellant's motion for new trial, the trial court concluded that Appellant "failed to make a showing that the pertinent witness, who faced a pending misdemeanor charge in another court (State Court), had a substantial reason to cooperate with the prosecution" or that there was any pending plea offer that "might have swayed the witness's testimony." On this basis, the trial court held that the trial court did not abuse its discretion in prohibiting cross-examination of Thurman regarding this pending charge, but even "[i]f such limitation had been error, any error was harmless."

Pretermitting whether the trial court erred in limiting Appellant's cross-examination of Thurman, we agree that any error

was harmless. A constitutional error is harmless when the State "proves beyond a reasonable doubt that the error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly-admitted evidence or when the evidence against the defendant is overwhelming." *Davidson v. State*, 304 Ga. 460, 470 (4) (819 SE2d 452) (2018).

In this case, the evidence against Appellant, which included the eyewitness testimony of Young and her positive identification of Appellant as the person who shot the victim, was substantial. Young testified that she saw Appellant at the crime scene and watched him retrieve a shotgun from Allen's vehicle and start shooting. The officers who responded to the shooting found spent shotgun shells in the street near where the shooting occurred, as well as in the back yard of the residence Appellant shared with Allen. The victim died from injuries caused by buckshot from a shotgun. In addition, Allen placed Appellant at the crime scene at the time of the shooting and testified that Appellant was at the Dogwood Terrance apartment complex on the night of April 7, 2015,

24

to look for his missing cell phone. Thus, even if Appellant had discredited Thurman's testimony by impeaching her with evidence related to her misdemeanor charge, substantial evidence supported Appellant's convictions.

For these reasons, we conclude that the trial court's decision to prohibit Appellant from cross-examining Thurman about her pending misdemeanor charge was harmless beyond a reasonable doubt due to all of the evidence presented against Appellant and because the record does not demonstrate that the trial court's decision likely changed the outcome of the trial. See *Davidson*, 304 Ga. at 470 (4).

5. In Appellant's final contention, he asserts that, under *Lane v. State*, 308 Ga. 10 (838 SE2d 808) (2020), the cumulative effect of the errors that occurred at trial entitle him to a new trial. Specifically, Appellant claims that the combined prejudicial effect of the improper rulings by the trial court—the failure to suppress the illegally seized shotgun shell, the failure to afford Appellant an impartial jury, and the refusal to let Appellant cross-examine a key

25

witness about her pending criminal charge—requires a new trial. See id. at 17 (1) (holding that "the proper approach" to assessing multiple trial court evidentiary errors "is to consider collectively the prejudicial effect, if any," of those errors).

Given our conclusions above and even assuming that all of these errors should be considered cumulatively under *Lane*,[9] we conclude that Appellant has failed to establish that the "combined prejudicial effect" of these errors "requires a new trial." *Lane*, 308 Ga. at 21 (4). "We have yet to decide how multiple standards for assessing prejudice may interact under cumulative review of different types of errors," but "we need not do so here, because

_____

[9] *Lane* involved only evidentiary issues, which usually are easily cumulated. See *Lane*, 308 Ga. at 17 (1). We made explicit in *Lane* that "[s]ome other types of error may not allow aggregation by their nature, but that question is not presented here." Id. And we stated that "[i]f a defendant in a future case seeks to argue to the reviewing court that he is entitled to a new trial based on the cumulative effect of errors outside of the evidentiary context, he would do well to explain why [cumulative error] should be extended beyond the evidentiary context." Id. at 17-18 (1). Here, Appellant seeks to aggregate harm from the admission of a shotgun shell, refusal to allow cross-examination on an unrelated point, and a jury issue, but makes no argument as to why we should apply *Lane*'s cumulative error approach in this new context, much less how we might aggregate harm from an allegedly partial juror with harm from two unrelated evidentiary decisions.

[Appellant's] claims of cumulative prejudice fail under even the higher standard implicated by these errors." *Pender v. State*, 311 Ga. 98, 120 (6) (856 SE2d 302, 321) (2021).

*Judgment affirmed. All the Justices concur.*