319 Ga. 267
FINAL COPY

S24A0263. HEAD v. THE STATE.

BOGGS, Chief Justice.

Appellant Nicholas Bernard Head challenges his convictions for malice murder and other crimes in connection with the shooting death of Quintavia Wade. Appellant contends that his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution were violated when the State read into evidence prior testimony given about the murder weapon by Emily Bagwell, the State's firearms expert, and that the trial court committed plain error in allowing another firearms examiner, Kyle Wheelus, to testify as a "verifier" of Bagwell's analysis about the bullet recovered in Wade's autopsy. We conclude that, even assuming that there was error with regard to the admission of Bagwell's prior testimony about the murder weapon, any error was harmless beyond a reasonable doubt given the overwhelming evidence against Appellant, including the testimony of two police officers who

witnessed the shooting. Additionally, because Wheelus's testimony was based on his own ballistics analysis, there was no plain error in allowing his testimony. Accordingly, we affirm.[1]

1. The evidence presented at trial showed the following.[2] On

---

[1] Wade was killed on October 16, 2017. On June 26, 2018, a Clarke County grand jury indicted Appellant for malice murder and other crimes in connection with Wade's death. That indictment was nolle prossed. On April 13, 2021, a Clarke County grand jury indicted Appellant for the following crimes related to the death of Wade: malice murder, three counts of felony murder, aggravated assault with a deadly weapon, false imprisonment, possession of a firearm during the commission of a felony, and two counts of possession of a firearm by a first offender probationer. It also indicted Appellant for an earlier aggravated assault and simple battery against Courtney Williams. One felony murder count was quashed, and at a trial from August 9-12, 2021, the jury acquitted Appellant of the counts involving Williams and found him guilty on all remaining counts. The trial court sentenced Appellant to serve life in prison with the possibility of parole for malice murder and consecutive terms of imprisonment totaling 15 years for two of the weapons charges. The felony murder verdicts were vacated by operation of law, and the trial court merged the other counts for sentencing. See *Dixon v. State*, 302 Ga. 691, 696-698 (808 SE2d 696) (2017). On August 16, 2021, Appellant filed a motion for new trial, which he amended with new counsel on October 4, 2022. After an evidentiary hearing on November 2, 2022, the trial court entered an order denying the motion on May 5, 2023. The trial court twice vacated and reentered the order denying the motion for new trial (once because the order was not served on Appellant's counsel and once for a technical glitch with an e-filing system), and Appellant filed a timely notice of appeal. The case was docketed in this Court to the term beginning in December 2023 and submitted for a decision on the briefs.

[2] Because of the harmless error analysis undertaken in Division 2, we set out the evidence in detail rather than recounting it in the light most favorable to the jury's verdict. See *Moore v. State*, 315 Ga. 263, 264 n.2 (882 SE2d 227) (2022).

October 16, 2017, Appellant's former girlfriend, Courtney Williams, went to retrieve some of her clothes from the home that she and Appellant formerly shared. Her friend Wade was with her, though Williams and Wade drove separately. Williams was scared to be around Appellant, and when she arrived at the home, she thought she saw someone inside the house by the window. Believing Appellant to be there, she drove away and called 911. Officers responded and while an officer was standing next to Williams, Williams answered a call from Appellant. The officer spoke loudly and said that if Appellant was in the house, he needed to come out and talk to the officers. Appellant told Williams he was not in the house, and officers later confirmed that fact. After receiving information from the officer about how to obtain a temporary protective order, Williams and Wade went to the courthouse in Wade's car, but Williams did not have her ID and could not apply for the TPO. Wade then drove Williams back to Williams's home, and while en route, Wade received a call from someone named Jeff who asked for a ride. After picking up Jeff, Wade dropped Williams back

3

off at Williams's home.

Later that afternoon, after Wade had returned to her own apartment, Appellant arrived at Wade's apartment. Yasmeen White, Wade's friend and co-worker, arrived at Wade's apartment sometime after Appellant arrived. White parked her car on the street, and when she exited her car, she saw Appellant and Wade outside the apartment on the back patio, which faced the street. Appellant was pushing Wade against the apartment wall, and as White walked toward the back patio, Appellant said "what's up, Yas?" White entered the apartment through the back patio door and saw that Appellant had a pistol in his back pocket. White heard Appellant tell Wade that he wanted Wade to call Williams and tell Williams to come to the apartment. Wade said that she could not call Williams because Appellant had her phone, and Appellant told Wade to use White's phone. White gave her phone to Wade. Wade called Williams and told her that Appellant had "ripped her bra, and put a gun to her head"; that Appellant "was going to kill her" if Williams did not come to Wade's apartment; and that if the police

4

came, Appellant was going to shoot Wade. Wade gave the phone back to White, and White saw that Wade had typed "911" on the keypad and understood from Wade's nod of her head that Wade wanted White to call 911 without alerting Appellant. White went inside a closet, called 911, and told the operator that a man had a gun and was threatening to kill Wade. After the phone call between Williams and Wade ended, Williams also called 911 and reported that Appellant was at Wade's apartment and was threatening to kill her. The jury heard both 911 calls.

Officers Shawn Denmark and Edward Herron, both of the Athens-Clarke County Police Department, responded to the 911 calls. As they arrived, they saw Appellant and Wade on the back patio. Officer Herron testified that his initial thought was that Appellant and Wade "were playing." However, he then saw Wade walking backward while Appellant had "something like a gun in his hand," and he observed Wade "swatting at" Appellant to "redirect or . . . swing at his arms." Wade's hands were open, and she did not hit the gun or ever gain control of the gun. He saw Appellant shoot

5

Wade, and in response, Officer Herron fired his service weapon, a nine-millimeter Glock, in the direction of the back patio. Appellant was not hit and retreated into the apartment. Appellant then stepped back onto the patio with one foot but remained partially out of view. Officer Herron repeatedly told Appellant to drop the gun and put his hands up. Appellant did not comply. Instead, he yelled something indistinguishable at the officers, and then shot himself in the face. After Appellant shot himself, the gun he was holding discharged again. As Appellant fell to the ground, he appeared to fall on top of the gun.[3]

The State played body camera footage from Officer Herron, although the recording does not show what happened on the back patio. However, the recording included Officer Herron's statements over his radio and to other officers describing the shooting moments after it occurred. Officer Herron first said, "I shot off three rounds after he shot her." Shortly thereafter, Officer Herron said that "the

---

[3] The trial testimony does not make clear whether Appellant fired the gun again after shooting himself and then dropped it or whether he dropped the gun after shooting himself and the gun discharged accidentally.

male shot the female" as Officer Herron was getting out of the car and that they were "tussling over the gun; he shot himself when I told him to get on the ground." Officer Herron acknowledged during his testimony that in a use-of-force investigation with GBI agents that occurred the same day as the shooting, he said that he never actually saw a gun and that he was not able to see Wade's head clearly for part of the time.[4]

Officer Denmark testified that he saw Appellant shoot Wade in the head. He described Appellant and Wade as being in a "physical altercation," with Appellant walking backward, with his left hand on Wade's right shoulder, dragging Wade onto the patio and holding her in a "bent over" position. Officer Denmark acknowledged that in prior testimony, he said that he was not looking directly at Appellant and Wade. Officer Wang of the Athens-Clarke County Police Department was the first officer to approach the patio after Appellant shot himself; Appellant and Wade were both lying on the

---

[4] A portion of Officer Herron's interview with GBI agents was played for the jury, but the record does not indicate precisely which portion was played.

ground. The gun was not visible at first, but when Officer Wang stepped close to Appellant's shoulder, Officer Wang saw the gun "right beside [Appellant] on the other side of his body." Officer Wang picked up the gun, which was a Taurus nine-millimeter handgun. Appellant was arrested and taken to a hospital, where he recovered from the self-inflicted gunshot wound.

The medical examiner who conducted Wade's autopsy recovered several parts of a bullet from Wade's head and concluded that the cause of death was a single gunshot wound to the top of Wade's head. The medical examiner also examined Wade's hands and found no evidence of defensive wounds or bruises or scrapes on her hands.

GBI firearms examiner Emily Bagwell, whose testimony from a prior probation revocation hearing was read into evidence at trial by the State, served as the primary firearms examiner in this case. In that capacity, she examined the bullet that the medical examiner extracted from Wade's head. She also examined and test-fired the Taurus nine-millimeter handgun that Officer Wang found next to

8

Appellant. Bagwell concluded that the bullet recovered during Wade's autopsy was shot from the Taurus handgun and that the bullet could not have been fired from a Glock handgun. She also conducted a trigger pull test and concluded that the Taurus did not have a "hair trigger," which she described as a "very light trigger" or one that will fire with around one pound of pressure or less. She concluded that the Taurus would need a pull force of at least four and one-half pounds to fire; she did not conduct a test to see if the gun would fire if dropped. She explained that to fire the gun, a person would have to pull backward on the slide to load a cartridge into the chamber and then pull the trigger.

After Bagwell completed her examination of the bullet and the Taurus, GBI firearms examiner Kyle Wheelus performed the next stage of the GBI's standard examination, which involved serving as a "verifier" of some of Bagwell's findings. Wheelus testified at trial that he used a microscope to examine the bullet received from the medical examiner and concluded that the bullet could not have been fired from a Glock and could have been fired from a nine-millimeter

gun made by one of seven manufacturers, including Taurus. Wheelus did not determine whether the bullet was fired from the Taurus recovered at the scene and did not test or fire the Taurus. Mark Tanner, a firearms examiner with the GBI, also served as a "verifier" and testified at trial. He compared the bullet from the autopsy and a bullet that was test-fired from the Taurus and concluded that the bullet recovered in the autopsy was fired from the Taurus. Tanner did not examine the Taurus.

Appellant did not testify at trial, and his counsel argued for an acquittal based on accident. In opening arguments, Appellant's counsel told the jury that Appellant did not bring a gun to the apartment; that the gun was already at the apartment and was likely left there by "Jeff," the man to whom Wade had given a ride; and that Wade picked up the gun, Appellant "grabbed for" the gun because he wanted her to put it away, they wrestled over it, and the gun went off. In closing arguments, Appellant's counsel again argued that Appellant did not bring a gun to the apartment; that Appellant "was one of two people tussling over the gun"; that the

gun went off when Wade had her hands on it; and that Appellant was "grabbing at [Wade] trying to push the gun away." The jury was charged that if it found "that the incident . . . occurred as a result of misfortune or accident and not as a result of a criminal undertaking or criminal negligence, then it would be your duty to acquit the Defendant."

2.    Appellant contends that the admission of Bagwell's prior testimony about the Taurus handgun — that it did not have a "hair trigger" and that it required at least four and a half pounds of pressure to fire — violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. See *Crawford v. Washington*, 541 U.S. 36, 54 (124 SCt 1354, 158 LE2d 177) (2004) (Confrontation Clause prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination."). As noted above, Appellant asserted a defense of accident, relying on Officer Herron's statements that he initially believed Appellant and Wade were

playing and that he saw them "tussling" over the gun. Appellant contends that the error in admitting Bagwell's testimony was harmful because the "trigger pull" testimony allowed the jury to reject his accident theory. The State argues that Appellant failed to preserve this claim for ordinary appellate review because he did not specifically rely on the Confrontation Clause in any of his objections at the pretrial hearing or at trial and that regardless, any error was harmless. As explained below, we assume, without deciding, that the claim was preserved and that there was error, but we conclude that any error was harmless beyond a reasonable doubt.

At a pretrial hearing on August 3, 2021, approximately one week before trial, the State indicated for the first time that it intended to read into evidence at trial Bagwell's testimony from Appellant's probation revocation hearing, which took place approximately three years earlier.[5] The prosecutor informed the

---

[5] At the time of the offenses against Wade, Appellant was serving a sentence of probation under a first-offender plea. The probation revocation petition sought to revoke Appellant's first-offender status based on his commission of the offenses against Wade.

trial court that on July 22, 2021, his office tried to subpoena Bagwell by e-mail and received an automated response stating that Bagwell was "not available." After contacting a GBI manager, the prosecutor learned that Bagwell began maternity leave in early July and would not return until October 1, 2021. Appellant objected, arguing, in part, that the State had not served Bagwell with a subpoena; that Bagwell had not traveled out of the country; that maternity leave, by itself, did not constitute unavailability or inability to testify; and that while Bagwell was subject to cross-examination at the prior hearing, counsel would have a different approach and strategy at trial and that "the availability for cross-examination is not equivalent." The trial court ruled that Bagwell was "unavailable" and that her prior testimony could be read into evidence at trial. Prior to Bagwell's testimony being read at trial by an employee of the District Attorney's office, Appellant renewed his prior objection.

We assume, without deciding, that Appellant sufficiently preserved his Confrontation Clause objection for ordinary appellate review. Compare OCGA § 24-1-103 (a) (1) (Party challenging

13

admission of evidence must state "specific ground of objection, if the specific ground was not apparent from the context[.]"); *Durham v. State*, 296 Ga. 376, 379 (768 SE2d 512) (2015) (noting "distinct difference" between hearsay and Confrontation Clause objections to admission of evidence), disapproved of on other grounds, *Leonard v. State*, 316 Ga. 827, 835 n.6 (889 SE2d 837) (2023). Nevertheless, we need not resolve whether the State met its burden to show that Bagwell was unavailable and whether the admission of Bagwell's prior testimony violated Appellant's right of confrontation. See *Ohio v. Roberts*, 448 U.S. 56, 74-75 (100 SCt 2531, 65 LE2d 597) (1980) (prosecution bears burden of establishing whether witness is unavailable for Confrontation Clause purposes), overruled on other grounds, *Crawford*, 541 U.S. at 60-69. See also *State v. Hamilton*, 308 Ga. 116, 121-122 (839 SE2d 560) (2020) (proponent of hearsay evidence of "unavailable" witness under OCGA § 24-8-804 bears the burden of proving unavailability). Even an error of constitutional dimension, such as the denial of the right of confrontation, may be harmless if "the State proves beyond a reasonable doubt that the

14

error did not contribute to the verdict, such as . . . when the evidence against the defendant is overwhelming." *Jones v. State*, 314 Ga. 605, 616 (878 SE2d 505) (2022) (cleaned up).

Here, any error was harmless beyond a reasonable doubt because the evidence was overwhelming. As noted above, the jury was charged on Appellant's theory that the shooting was an accident. See OCGA § 16-2-2 ("A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence."). The jury also heard Appellant's theory of accident in opening and closing arguments. However, the evidence that Appellant intentionally shot Wade was overwhelming. White testified that when she first saw Appellant and Wade, Appellant was pushing Wade against the apartment wall, and White saw a gun in Appellant's back pocket. White and Williams both testified about Appellant's threats to shoot Wade, and the jury heard 911 calls detailing those threats. Minutes after the 911 calls, Appellant pulled or pushed Wade on to the patio, forcing her to bend

15

over. Officers Herron and Denmark both testified that they saw Appellant shoot Wade. The jury also heard Officer Herron's statements moments after the fatal shooting in which he said that Appellant shot Wade. Officer Herron further testified that he could see Wade's hands, which were open and were not on the gun. This testimony contradicted Appellant's theory that the shooting was an accident that occurred during the struggle over the gun. Moreover, the jury heard the medical examiner's testimony that the bullet entered the top of Wade's head and that Wade had no defensive wounds on her hands. Finally, the State did not reference Bagwell's "trigger pull" testing on the Taurus in opening or closing arguments. Reviewing this record de novo and weighing the evidence as a reasonable juror would, see *Moore v. State*, 315 Ga. 263, 271 (882 SE2d 227) (2022), we conclude that the State has carried its burden of showing beyond a reasonable doubt that the admission of Bagwell's prior testimony about the "trigger pull" of the murder weapon did not contribute to the verdict and thus that any error was harmless beyond a reasonable doubt. See, e.g., *Jones*, 314 Ga. at 615-

16

616 (pretermitting whether trial court erred in limiting cross-examination of witness in violation of defendant's right of confrontation and concluding any error was harmless beyond a reasonable doubt in light of substantial evidence against the defendant); *Soto v. State*, 285 Ga. 367, 370-372 (677 SE2d 95) (2009) (error in admitting out-of-court statement to police in violation of the defendant's right of confrontation was harmless beyond a reasonable doubt in light of overwhelming evidence against the defendant).

3. Appellant contends that the trial court committed plain error in allowing Wheelus to testify as a "verifier" of Bagwell's ballistics analysis. To show plain error, Appellant must identify an error that was not affirmatively waived; that was clear and obvious beyond reasonable dispute; that affected his substantial rights, which generally requires an "affirmative showing" that the error probably did affect the outcome below; and that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Ruthenberg v. State*, 317 Ga. 227, 230-231 (892 SE2d

17

728) (2023). We need not analyze all prongs of plain error review where appellant fails to establish one of them. See *Williams v. State*, 315 Ga. 490, 496 (883 SE2d 733) (2023).

Here, Appellant's argument appears to be that Wheelus was merely a "surrogate" for Bagwell and that his testimony was inadmissible because he did not examine the Taurus. See generally *Disharoon v. State*, 291 Ga. 45, 47-48 (727 SE2d 465) (2012) (discussing *Bullcoming v. New Mexico*, 564 U.S. 647, 652 (131 SCt 2705, 180 LE2d 610) (2011), and holding that expert with significant personal connection to forensic test could testify in lieu of scientist who actually conducted it). However, Appellant fails to recognize that Wheelus performed his *own* analysis and testified about his *own* examination of the bullet received from the autopsy. Wheelus did not testify, for example, about Bagwell's "trigger pull" test. Rather, based on his independent analysis, he concluded that the bullet could not have been fired from a Glock but could have been fired from a gun made by one of seven manufacturers, including Taurus. Under these circumstances, we conclude that Appellant has

failed to show trial court error, much less plain error, in permitting Wheelus to testify about his own examination of the bullet recovered from the autopsy.

*Judgment affirmed. All the Justices concur.*

Decided June 11, 2024.

Murder. Clarke Superior Court. Before Judge Haggard.

*David T. Douds*, for appellant.

*Deborah Gonzalez, District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Meghan H. Hill, Senior Assistant Attorneys General, Grace G. Griffith, Assistant Attorney General*, for appellee.