NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: April 19, 2022

S22A0348.  RENFRO v. THE STATE.

BOGGS, Presiding Justice.

Appellant David Renfro challenges his 2019 convictions for malice murder and other crimes in connection with the shooting death of Rita Hennon.[1] In his sole enumeration of error, Appellant

---

[1] The crimes occurred on May 23, 2017. On July 14, 2017, a Baldwin County grand jury indicted Appellant for malice murder, felony murder during the commission of aggravated assault with a deadly weapon, felony murder during the commission of possession of a firearm by a convicted felon, aggravated assault, two counts of cruelty to children in the first degree, and possession of a firearm by a convicted felon. At a trial from May 13 to 15, 2019, the jury found Appellant guilty of all counts except felony murder during the commission of an aggravated assault with a deadly weapon, on which it found him guilty but mentally ill at the time of the crime. The trial court sentenced Appellant to serve life in prison for malice murder, 20 years to serve consecutively for each count of cruelty to children in the first degree, and five years to serve concurrently for possession of a firearm by a convicted felon. The court merged the remaining aggravated assault charge, and the remaining felony murder charges were vacated by operation of law. On June 6, 2019, Appellant filed a motion for new trial, which he amended with the assistance of new counsel on June 21, 2021. The trial court held a hearing on the motion for new trial on June 25, 2021, and denied the motion on July 8, 2021. Appellant filed a timely notice of appeal. The case was docketed in this Court

contends that the trial court erred in admitting his pre-arrest statements to police because he was allegedly under custodial interrogation and had not yet received *Miranda* warnings.[2] Because any error in admitting Appellant's statements was harmless beyond a reasonable doubt, we affirm.

1. The evidence at trial showed the following. On May 23, 2017, Rita Hennon and her two grandchildren were shopping at the K & C convenience store in Baldwin County. While Hennon was in the store, Appellant walked inside and then exited to stand next to an ice machine by the entrance for over four minutes. A surveillance video recording showed that when Hennon came out of the store and walked by the ice machine with her grandchildren, Appellant stepped out, pointed a pistol at her head, and shot her at point-blank range, killing her instantly.

Jeff Suggs arrived at the store to shop shortly before the

to the term beginning in December 2021 and submitted for a decision on the briefs.

[2] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

incident and noticed Appellant standing by the ice machine. While in line to check out, Suggs saw Hennon and her grandchildren walking out of the store. As he was leaving the store, Suggs heard a gunshot and saw Appellant run off the store property to the right, in the direction of a nearby Dollar General store. Suggs then saw Hennon on the ground and her grandchildren crying next to her body. Suggs ushered the children around to the other side of his truck to keep them from seeing Hennon's body. The bullet that killed Hennon also struck the side of Suggs' truck, although investigators were never able to find either the bullet or an expended shell casing.

Steve Dawson was in his car outside of the store at the time of the shooting. Although he did not see the shooting happen he heard the shot and looked up to see Appellant holding a gun next to Hennon's body. Dawson described Appellant as a "black male" wearing "dark colored pants and a white shirt." As Appellant began to run, Dawson drew his own gun, jumped out of the car, pointed his gun at Appellant, and yelled at him to "stop." Appellant did not stop and instead crossed the highway and continued on toward the Dollar

General. Dawson jumped back in his car to follow Appellant and was able to keep visual contact with him until Appellant "cut into the woods near Robins Drive." Dawson later identified Appellant in a photographic lineup.

Deputy Chanda Hogan was driving on Sparta Highway when her grandson pointed out Appellant running toward the Dollar General. Deputy Hogan described Appellant as a "tall, slim[, and] . . . clean shaven" black male with "short hair" wearing a "[w]hite shirt, . . . dark pants, [and] black tennis shoes." Deputy Hogan was flagged down by Dawson's wife, who was inside the store at the time of the shooting and told Deputy Hogan that Hennon had been shot. After calling into dispatch and interviewing witnesses at the scene, Deputy Hogan realized that the man she saw running was the shooter; she also realized she knew who Appellant was and where he lived on Robins Drive.

The shooting was video recorded by the store's surveillance camera, and the recording shows that Appellant was wearing a baseball cap when he committed the crimes. When police

4

investigators obtained the recording, Detective T.J. Hargrove was able to identify the shooter as either Appellant or Danny Renfro, twin brothers who lived together with their family on Robins Drive within a mile of the store. Officers were then sent to Appellant's residence to secure the premises until the police obtained a search warrant.

Deputy Oscar Garcia and Detective Charles Seay were among the first to arrive at Appellant's residence. As they approached the residence, Detective Seay obtained permission to enter the residence from Damon Renfro, Appellant and Danny's father, while other officers surrounded the house. Detective Seay went inside and came back out with Appellant and Danny. Appellant had no beard, short hair, and was wearing pants with no shirt, while Danny had a beard, long hair, and was wearing shorts with a shirt. Detective Seay "asked them if they'd been anywhere, and they both stated they'd been home all day." After Danny asked what happened, and an officer said there was a shooting at the K & C store, Appellant denied knowing anything about the shooting and told the officers that there

5

were "always shooting[s] back that way," while pointing in the direction of the K & C. While Detective Seay was speaking with Appellant and his brother, several other police officers surrounded both sides of the house. Appellant's entire interaction with Detective Seay was recorded on Deputy Garcia's body camera, and the recording was played for the jury.

Deputy Garcia testified for the State at trial. When asked on cross-examination if Appellant, his brother, or his father were free to leave during the conversation on the porch, Deputy Garcia stated that "they were not under custodial arrest." When asked if the police had "secured the residence," Deputy Garcia said, "Yes." Finally, when asked again if "they weren't free to go," Deputy Garcia said, "Correct."

The police searched Appellant's house after his arrest. Among several items recovered was a nine-millimeter handgun without a serial number that was found in the laundry room in a shoe box next to a pair of Appellant's black boots. Yvonne Tate, Appellant's mother and the owner of the residence, voluntarily led the police to her three

firearms in the master bedroom and affirmatively stated that those were the only firearms in the house. The police also photographed Appellant's baseball cap, which was hung up on a nail in the bathroom. [3]

Appellant asserted an insanity defense, and, pursuant to a court order, forensic psychologist Valerie Ross interviewed Appellant to assess his competency and mental state. Dr. Ross reviewed the indictment, the incident report, supplemental reports from the police, and Appellant's medical and school records, among other things, to prepare for the interview.

Dr. Ross was called by the State and testified that she advised Appellant of the purpose of the interview and he appeared to understand; that he was "well-groomed" and his mood "appeared normal"; that he maintained eye contact and had no abnormal psychomotor movements; that he spoke normally; and that he was able to provide background information and his medical history.

---

[3] This appears to be the same black and white baseball cap with "ATLANTA" on the front that Appellant is seen wearing in the surveillance recording of the shooting.

7

Appellant told Dr. Ross that he had been hospitalized for psychiatric reasons and often had paranoid thoughts and auditory hallucinations. When asked about the shooting, Appellant told Dr. Ross that he did not know who Hennon was but that he was outside the store and "heard a voice saying [']stop her[']" because, he claimed, Hennon "had a kid bent over" and was pulling the child's pants down and "about to fondle him."[4] Appellant did not remember having a gun, and he did not remember how he got back home after the shooting. Appellant was on prescription antipsychotic medication at the time of the interview.

Dr. Ross testified that she believed Appellant was schizophrenic but that did not automatically lead her to conclude he was criminally insane at the time of the offense. Instead, she believed Appellant knew "what he did was wrong." She came to this conclusion because

> there were some behaviors that he engaged in that suggested that he knew at the time that his behavior was

---

[4] Despite relaying what he allegedly heard to Dr. Ross, Appellant never stated to her that he committed the shooting, instead contending that he had no memory of what happened after he heard the voice.

wrong, including that he . . . ran away from the scene of the crime, that he showered immediately upon returning home, and that . . . within a short period of time, when law enforcement arrived at his residence and were asking him where he'd been that day, he said he'd been home all day, despite having just gotten back from the convenience store.

Dr. Ross also testified that while Appellant reported that his antipsychotic medication had run out two days prior to the shooting, it would have "remain[ed] in his system for a certain time" after Appellant stopped taking it and you "wouldn't expect the symptoms to be so significantly pronounced that quickly." Additionally, Dr. Ross watched a surveillance recording of the shooting and testified that she did not see anything in the recording that indicated that Appellant "was experiencing auditory hallucinations or having beliefs that were upsetting to him or concerning him in any way that he reflected physically."

Appellant's sister, Krystal Renfro, was the only witness for the defense at trial. Krystal testified about her experience with Appellant's history of schizophrenic delusions and how his actions changed when he was medicated. Specifically, Krystal testified that

9

Appellant was

> very complacent when he's medicated. He will sit down, like he will wait for you to tell him what to do. He was very childlike. But off the medication, he was agitated, he wasn't really calm, [he was] irritated. He was ready to walk, like he had to go. He had to move.

When asked whether "he was not seeing things and hearing things all the time," she responded, "Not when he was medicated." On cross-examination, Krystal agreed with the prosecutor that when Appellant was on his medication, he was "polite[,] . . . compliant[,] . . . [and would] respond directly to you if you ask a question," but that when he was not on his medication he was "ranting[,] . . . yelling[,] . . . and clearly talking to people who aren't there." Krystal was asked, "if we've seen a video of him compliant, calm, not yelling, clearly not speaking to any voices, [does that mean] he's probably on his medication?" Krystal responded, "[n]o, not all the time, not like that," and clarified that "there are moments, rare moments, when he's not on the medication, that he will be calm."

2. Appellant contends the trial court erred in allowing into evidence over his objection the statements he made to the police on

his porch before he was arrested or given *Miranda* warnings. Specifically, Appellant argues that he was under custodial interrogation but had not received *Miranda* warnings, so the admission of his statements violated his privilege against self-incrimination under the Fifth Amendment to the United States Constitution.

Pretermitting whether the trial court erred in admitting Appellant's statements, we conclude that any error in their admission was harmless beyond a reasonable doubt. Even if a trial court errs, and

> the error is one of constitutional magnitude, it can be harmless error if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly-admitted evidence or when the evidence against the defendant is overwhelming.

*Davidson v. State*, 304 Ga. 460, 470 (4) (819 SE2d 452) (2018) (citation and punctuation omitted). When applying a constitutional harmless-error analysis, "we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have

done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Ensslin v. State*, 308 Ga. 462, 471 (2) (d) (841 SE2d 676) (2020) (citation and punctuation omitted).

Here, the allegedly improperly admitted evidence Dr. Ross referenced was essentially cumulative of other evidence that was properly admitted during the trial. While Dr. Ross did use portions of Appellant's statements to support her conclusion that he was sane at the time of the shooting, the statements were only one example of Appellant's conduct that she used to support that conclusion. In addition to Appellant's statements, Dr. Ross also cited Appellant's fleeing the scene, showering, and changing clothes when he got home as additional indications that he knew that what he did was wrong; moreover, her observation of the surveillance video of the shooting revealed no visible sign of a schizophrenic delusion from Appellant. And, even though Dr. Ross believed Appellant to be schizophrenic, she concluded from his behavior during and immediately following the shooting that he was not acting under a delusion and was aware of his actions. Dr. Ross' conclusion was

based predominately on other, cumulative, admissible evidence. See *Davidson*, 304 Ga. at 470 (4).

Likewise, any use of Appellant's statements in closing argument was also harmless beyond a reasonable doubt. While the prosecutor commented on Appellant's pre-*Miranda* statements made to the police to support the conclusion that he deliberately concealed Hennon's murder, the statements were only a small part of Appellant's behavior that the State relied on to support this conclusion. The prosecutor also highlighted the evidence that Appellant took the time to change clothes and hang up his hat when he returned home from shooting Hennon and had a concealed firearm with no serial number and ammunition that the owner of the house did not know of. The prosecutor further argued that Appellant took a gun with him to the convenience store and waited behind the ice machine for over four minutes before shooting Hennon, further undermining Appellant's claim that he spontaneously had a delusion and acted on it. As such, the prosecutor's comments on Appellant's statements were cumulative

13

of the many other instances of Appellant's behavior that the State used to argue that he intentionally concealed the crime.

Because any reliance on Appellant's statements by Dr. Ross in her evaluation and the State in its closing argument was cumulative and did not affect the verdict, any error in admitting Appellant's statements was harmless beyond a reasonable doubt. See *Frazier v. State*, 278 Ga. 297, 298 (4) (602 SE2d 588) (2004) (holding that even if the questioning officers failed to honor the defendant's right to remain silent, the admission of his statements was harmless beyond a reasonable doubt because they were cumulative of other properly admitted evidence).

*Judgment affirmed. All the Justices concur.*