315 Ga. 712
FINAL COPY

S23A0054. HAUFLER v. THE STATE.

MCMILLIAN, Justice.

In June 2021, a jury found Chad Haufler guilty of malice murder and other crimes in connection with the shooting death of Marc Dimos.[1] On appeal, Haufler asserts that the trial court erred in failing to instruct the jury on involuntary manslaughter and in denying his pretrial motion to suppress certain statements he made in the presence of law enforcement officers. For the reasons that

---

[1] Dimos was killed on August 28, 2018. On January 28, 2019, a Greene County grand jury indicted Haufler for two counts of malice murder (Counts 1 and 3), felony murder predicated on aggravated assault (Count 2), felony murder predicated on aggravated battery (Count 4), possession of a firearm during the commission of a felony (Count 5), aggravated assault (Count 6), and aggravated battery (Count 7). At a trial held from June 14 to 18, 2021, the jury found Haufler guilty of all counts. The trial court sentenced Haufler to serve life in prison for the first count of malice murder, plus a consecutive term of five years in prison for the firearm possession count; the remaining counts were either merged for sentencing purposes or vacated by operation of law. Haufler timely filed a motion for new trial, which he amended on February 11, 2022. Following a hearing, the trial court denied the motion on March 16, 2022. Haufler timely appealed, and the case was docketed to the term of this Court beginning in December 2022 and orally argued on December 8, 2022.

follow, we affirm.

The evidence presented at trial shows that Haufler and Dimos met in October 2017 on a hunting trip in Colorado and went on various hunting and fishing trips together over the following year. When Haufler began having trouble in his marriage, he asked Dimos to come stay with him at his lake house in Greene County, Georgia. Dimos agreed and flew out the next morning, on August 26, 2018. Haufler and Dimos spent all of August 26 and 27 together, fishing on Lake Oconee and eating at local restaurants.

They returned to Haufler's home around 9:15 p.m. on the night of August 27. Throughout the night, multiple phone calls and text messages were made from Dimos's cell phone. Around 4:15 a.m., a text message was sent to Dimos's wife with a picture of a bottle of Captain Morgan rum and the caption "Captain Jack Sparrow." Between 5:36 and 5:40 a.m., several FaceTime calls were made to a number saved as George Kashimer, none of which connected; at 5:41 a.m., Haufler called Kashimer from Dimos's phone and left a voicemail message. The next use of Dimos's phone was Haufler's call

2

to 911. At 6:34 a.m. Haufler reported that he had been the victim of a home invasion by three men and that he believed he had shot one in the head.

As Deputy Travis Heath of the Greene County Sheriff's Department was responding to the call, he saw a man later identified as Haufler walking along the road with a gun in his right hand, which was later identified as a Glock 23 .40-caliber handgun. Haufler complied with Deputy Heath's command to put the gun down and get in the back of the patrol car. As they drove to Haufler's home, Haufler was "irate" and "going on about having intruders in the house and he had just shot someone." Haufler remained in the back of the patrol vehicle while officers worked to secure the home and its perimeter. Although Haufler initially told officers that he had shot an intruder, at other times, Haufler stated that he had shot a man named "Johnny Russ" and that all of a sudden he was being choked, adding, "Thank God I had a gun in my bedroom . . . [w]ent and shot them bastards." He also stated that his wife "might be involved with this" and that they were "in a separation." Later,

3

Haufler said that Dimos had put him in a chokehold, that he was about to pass out but freed himself, and that he then put Dimos in a chokehold, got his gun, and shot Dimos in the head. Haufler's statements were recorded by the patrol car's dash-cam and played for the jury at trial.

The GBI was called to assist at the scene; they located no other people in the home and found no signs of forced entry. There were no signs of a struggle except in the basement, where officers found Dimos on a couch with a large pool of blood under his body. Officers located an unspent round near the stairs leading to the basement and another unspent round and a shell casing near Dimos's body. They also found a holster in the master bedroom on the main floor. Haufler's Glock handgun had a live round in the chamber and six rounds in the 13-round capacity magazine.

GBI Special Agent Brian Hargrove, an expert in bloodstain analysis and latent fingerprint development, testified that there were two separate pools of blood about fifteen to eighteen feet apart, one against the far wall of the basement and the other underneath

4

the victim's body on the couch, with a few drops of blood connecting the pools. In the pool of blood against the wall, there was a "void" and other evidence consistent with Dimos having lain on his back while bleeding from his face long enough for the blood that flowed to the back of his head to coagulate. Near this pool of blood was a dented popcorn kettle with Dimos's blood on one side. The blood spatter on the popcorn kettle showed that the blood was traveling away from the area with the dent. Blood spatter stains on the wall indicated that Dimos was lying on his back when he was struck in the face with the popcorn kettle. The drip trail of blood between the two pools of blood was consistent with Dimos moving across the room and settling on the couch where he was later shot in the face while in a seated position. The kickback of blood spatter indicated that Dimos was already bleeding from his face at the time he was shot.

Officers observed only minor injuries on Haufler, including a "mark" on his left cheek, a minor scratch behind his right ear, a small scratch on his right ankle, a "scrape" on his right forearm, and

5

abrasions on and around both knees. GBI Special Agent Michael Maybin testified that the abrasions below Haufler's knees appeared to be from crawling on a hard surface and that Haufler did not have any injuries on his neck apart from some redness that appeared to be a sunburn all over his face and neck. When Haufler was photographed again three days later, a small bruise had appeared on his left arm and his left thigh, but no bruising appeared on his neck, although the redness from the apparent sunburn was still present.

The medical examiner testified that Dimos had 24 different injuries to his face that were consistent with being hit from multiple angles and were very unlikely to have been the result of a single blow or from falling.[2] The fatal gunshot wound was made from a 20-degree downward angle, indicating that the gun was elevated above

---

[2] Dimos was diagnosed with Lewy Body Dementia in 2016, and his treating neurologist testified that Dimos's mobility had worsened over the years and that alcohol would further hamper Dimos's mobility, such that if he were thrown to the floor, Dimos would have had trouble getting back up.

Dimos's head when he was shot.[3] Because there was no stippling on Dimos's face, the gun was a minimum of 18 inches away from his face when it was fired, and there were no burn marks or injuries to Dimos's hand that would indicate he had any contact with the gun at the time of its discharge.[4] Dimos had blood in his airway, meaning he had likely inhaled his own blood from his facial injuries prior to the shooting. The medical examiner testified that it was highly unlikely that Dimos could have walked away or had any consciousness following the gunshot to his face. She further opined that it was highly improbable that Dimos was running toward Haufler when he was shot because Dimos would have immediately fallen forward at the time and location of the shooting. Dimos had a blood alcohol content ("BAC") between 0.161 and 0.195 at the time of his death.

A GBI firearms examiner testified that the bullet recovered

---

[3] Haufler is five feet and eight inches tall; Dimos was six feet and one inch tall.

[4] No gunshot residue testing was done on either man's hands due to Haufler's admission that he had fired the gun.

during the autopsy was fired by a Glock .40-caliber gun, but she was not able to conclusively say that it was fired by Haufler's gun. However, the spent shell casing located on the basement floor near Dimos was fired from Haufler's gun. The firearms examiner explained that the Glock 23 handgun had a "drop safety," which ensured it would not accidentally discharge if dropped, and both a trigger safety and a firing pin safety, which prevent the gun from firing unless the trigger is pulled completely back. When the firearms examiner test-fired the gun, she found no malfunctions.

In support of his defense that he may have been experiencing a blackout at the time of the shooting, Haufler called Dr. Kim Fromme, a clinical psychologist who specializes in the effects of alcohol intoxication, to testify that alcohol can cause "blackouts" or periods of time in which a person is acting consciously but not forming memories. Dr. Fromme explained that when someone experiences a blackout that person will often attempt to "fill in [the] gaps to create . . . a personal narrative . . . about what happened." Dr. Fromme explained that because Haufler had experienced

8

blackouts in the past, as had his close relatives, he was at a high risk of experiencing blackouts when drinking, particularly hard liquor, such as tequila or rum. Based on evidence at the scene, including partially emptied bottles of hard liquor and the presence of shot glasses, Dr. Fromme opined that both men had been drinking heavily and that Haufler was likely experiencing a blackout at the time that he spoke to police.[5] Relying in part on Dimos's BAC of 0.161 at the time of autopsy, Dr. Fromme estimated that Haufler's BAC was 0.21 to 0.25 at the time he spoke to police, around three times the legal limit for driving. Dr. Fromme arrived at this estimate by extrapolating from Dimos's known BAC based on the men's relative body weights and studies that show people tend to consume alcoholic beverages in a 1:1 ratio when drinking with someone. Thus, Dr. Fromme opined, when Haufler told police that he had shot

---

[5] Although no evidence was presented about Haufler's actual BAC, Haufler told Deputy Heath that he had consumed "three or four drinks of Crown and Coke and maybe two shots of 1800 tequila" and that "in the meantime, [they] went down and had some pizza." Also, Dr. Fromme elected not to question Haufler about whether he believed that he had blacked out that night, and Haufler, who did not testify at trial, never claimed to have blacked out in his statements to police.

9

Dimos after a fight, he may have been experiencing a blackout from his alcohol consumption and may have just been extrapolating from limited evidence rather than from memory.

The defense also called Dr. Kimberly Collins, an expert in forensic pathology. Based on the circumstantial evidence from the scene, Dr. Collins testified that the gun could have discharged as the result of a struggle between Haufler and Dimos. The patterns of blood on Dimos's hand, including blowback on the back of his hand and sparing on the palm, indicated that Dimos could have been holding the gun at the time that it discharged.

1. Haufler asserts that the trial court committed reversible error by failing to instruct the jury on involuntary manslaughter. We are not persuaded.

"A charge on involuntary manslaughter should be given, upon a proper request, when there is slight evidence to support it." *Moon v. State*, 311 Ga. 421, 424 (2) (858 SE2d 18) (2021) (citation and punctuation omitted). "Whether the evidence was sufficient to warrant the requested instruction is a legal question, which we

review de novo." *Wade v. State*, 304 Ga. 5, 8 (2) (815 SE2d 875) (2018).

Felony-grade involuntary manslaughter is statutorily defined as "caus[ing] the death of another human being without any intention to do so by the commission of an unlawful act other than a felony." OCGA § 16-5-3 (a). A person commits misdemeanor-grade involuntary manslaughter "when he causes the death of another human being without any intention to do so, by the commission of a lawful act in an unlawful manner likely to cause death or great bodily harm." OCGA § 16-5-3 (b).

The record shows that, prior to trial, Haufler requested pattern jury charge 2.10.44, "Involuntary Manslaughter, Statutory Definition."[6] Although it is not clear from his written request whether Haufler was seeking a felony or misdemeanor involuntary manslaughter charge, at the various jury charge conferences

---

[6] This pattern charge states: "For involuntary manslaughter the State must prove that the Defendant (1) caused the death of another person (2) without intending to (3) by committing the offense of _____, which is defined as follows: (*offense must be a misdemeanor*)."

conducted throughout the trial, Haufler referred to reckless conduct,[7] pointing a gun at another,[8] and criminal negligence as the possible offenses that would support this charge.[9] The trial court ultimately denied the request, stating that "a lawful act done in an unlawful manner cannot ever be utilized when it involves a firearm."

On appeal, Haufler argues that this denial was error because there was slight evidence supporting both a felony and misdemeanor

---

[7] OCGA § 16-5-60 (b) provides that "[a] person who causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his or her act or omission will cause harm or endanger the safety of the other person" is guilty of misdemeanor reckless conduct where "the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

[8] OCGA § 16-11-102 provides that "[a] person is guilty of a misdemeanor when he intentionally and without legal justification points or aims a gun or pistol at another, whether the gun or pistol is loaded or unloaded." Where, however, "the pointing of a firearm places the victim in reasonable apprehension of immediate violent injury, then the felony of aggravated assault, rather than the misdemeanor of pointing a gun, has occurred." *Overton v. State*, 305 Ga. 597, 600 (2) (825 SE2d 159) (2019) (citation and punctuation omitted).

[9] The State asserts that Haufler failed to preserve for ordinary appellate review the issue of whether the trial court properly declined to give an instruction on misdemeanor involuntary manslaughter because he did not specifically request that charge. Based on the record before us, we conclude that Haufler made that request both in writing and during the charge conferences by orally requesting charges that would support misdemeanor involuntary manslaughter, and thus, the issue was preserved for ordinary appellate review.

involuntary manslaughter charge. Specifically, he argues that the jury could have found that Haufler accidentally discharged the firearm while intoxicated, constituting reckless conduct because he disregarded the substantial and unjustifiable risk that one will be unable to abide by safety precautions while under the influence of alcohol. Haufler also argues that there was sufficient evidence that he failed to take reasonable precautions in handling a firearm and thereby committed criminal negligence, enabling the jury to find him guilty of misdemeanor involuntary manslaughter. See *McIver v. State*, 314 Ga. 109, 122 (2) (c) (875 SE2d 810) (2022) (concluding that the mens rea required for misdemeanor involuntary manslaughter is "'criminal negligence'" and explaining that this mens rea is more culpable than civil negligence but less culpable than the mens rea required for "'reckless conduct'"). According to Haufler, because there was no evidence that he had any motive to hurt Dimos, the circumstantial evidence, as testified to by Dr. Collins, could support a finding that Dimos shot himself or was shot during a struggle. Also, Dr. Fromme opined that Haufler could have

13

been experiencing a blackout, so the jury could have reasonably believed that Haufler had blacked out from being so intoxicated such that his statements about intentionally shooting Dimos should not be believed and that instead the jury could have found that Haufler had shot Dimos through negligence or recklessness.

The State argues, however, that, while there need only be *slight* evidence to warrant a jury charge, this Court has held there must be some *affirmative* evidence in the record. See *Soto v. State*, 303 Ga. 517, 520 (2) (813 SE2d 343) (2018) ("The evidence that the defendant committed the lesser offense does not need to be persuasive, but it must exist." (citation and punctuation omitted)). According to the State, lack of evidence of something is not the standard upon which jury charges should be given. And here, the State argues, there was no evidence that Haufler was unaware that the gun was loaded or that he was negligently or recklessly handling the gun. Instead, the evidence showed that Haufler went upstairs to get the gun and intentionally shot Dimos in the face.

Pretermitting whether there was slight evidence warranting

14

an instruction on either felony or misdemeanor involuntary manslaughter, the evidence of Haufler's guilt for the crimes of which he was convicted was substantial, and it is therefore highly probable that the failure to charge on involuntary manslaughter did not contribute to the jury's verdict. See *Shah v. State*, 300 Ga. 14, 21 (2) (b) (793 SE2d 81) (2016) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (citation and punctuation omitted)). The State presented evidence that Dimos was severely beaten with a metal popcorn kettle, resulting in 24 different injuries to his face and head; that Dimos was shot from a distance of at least 18 inches while he was in a seated position, facing the shooter; and that Haufler stated multiple times that, after gaining the upper hand in a struggle with Dimos, Haufler went upstairs and retrieved his gun before shooting Dimos in the face. The ballistics evidence also supported that Haufler shot Dimos. And there was no evidence to support Haufler's initial story that he had shot someone in the process of warding off intruders. Thus,

15

pretermitting whether the trial court erred in declining to give an involuntary manslaughter instruction, the failure to give the instruction was harmless. See *Howard v. State*, 307 Ga. 12, 20 (3) (834 SE2d 11) (2019). ("[A]n erroneous jury charge is not reversible unless it causes harm." (citation and punctuation omitted)). Accordingly, this enumeration of error fails. See *Rogers v. State*, 289 Ga. 675, 677-78 (2) (715 SE2d 68) (2011) (no reversible error in failing to give involuntary manslaughter charge where there was overwhelming evidence inconsistent with appellant's version of events but supportive of the jury's finding him guilty of malice murder).

2. Haufler also asserts that the trial court erred in denying his pretrial motion to suppress statements he made to the deputy coroner while in the back of Deputy Heath's patrol car about going upstairs to get his gun after someone put him in a chokehold. Specifically, Haufler argues that the statements should have been excluded because he was in custody at the time and had not been

16

advised of his rights under *Miranda*.[10]

At the *Jackson-Denno*[11] hearing, Deputy Heath testified that, upon arriving at Haufler's home, Deputy Heath told Haufler to remain in the patrol vehicle "for a safety standpoint, for his and ours" and to avoid contaminating the scene. The air conditioning remained on in the vehicle, and Deputy Heath checked on Haufler periodically, letting him stand outside the vehicle for fresh air from time to time.

Haufler offered to have handcuffs placed on him, but Deputy Heath declined to do so because he was not under arrest or detained at the time. Deputy Heath explained that he did not read Haufler a *Miranda* warning because "[h]e wasn't under questioning. . . . I was just kind of holding him . . . for safety reasons and to make sure the scene was clear and untouched." Deputy Heath explained that Haufler was in the back of the patrol car for approximately one hour before the deputy took him to the sheriff's office. During that time,

---

[10] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[11] See *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

Haufler spoke freely to officers around him without prompting, often sticking his hand out of the vehicle or yelling to get their attention.

Deputy Coroner Bilbo, who also worked as an EMS provider for Greene County, testified that his boss, the Greene County Coroner, asked him to speak with Haufler at the scene to complete a coroner's report. He approached the patrol car and asked nearby officers if he could talk to Haufler, and they agreed. He explained to Haufler that he was a deputy coroner and proceeded to ask Haufler questions about what had happened. Haufler told him that Dimos had recently arrived from Ohio and that either Dimos or "another guy named Johnny Russ" had put him in a chokehold. Haufler then stated, "I don't know who it was, but all[ ] I know is they put me in a chokehold, and I went for my gun." When Deputy Coroner Bilbo asked Haufler if he had the gun in his possession at the time, Haufler responded, "No, it's in my bedroom. I went and got it." Haufler then confirmed that his bedroom was upstairs.

Deputy Coroner Bilbo also testified that he performed a physical and mental assessment of Haufler in his role as EMS and

did not identify any apparent injuries. And although Haufler was emotional and had apparently been drinking, he was able to communicate effectively and answer the questions posed to him. Deputy Coroner Bilbo confirmed that he had no arrest powers and was not a certified peace officer.

After reviewing a recording from Deputy Heath's patrol car dash-cam that included Haufler's interactions with both Deputy Heath and Deputy Coroner Bilbo and a recording of Deputy Heath's body camera,[12] the trial court denied the motion to suppress Haufler's statements to Deputy Coroner Bilbo about obtaining the gun. In doing so, the trial court found that Haufler was not in custody or subject to custodial interrogation; that Haufler voluntarily made statements to Deputy Heath and Deputy Coroner Bilbo, who was not a law enforcement official for purposes of

---

[12] Agent Maybin also testified at the hearing and explained that he first spoke to the responding officers at the scene before approaching Haufler in the patrol car. When he told Haufler he wished to speak with him, Haufler was "very agreeable" and cooperative. And, after he told Haufler that they wanted to take him to the Sheriff's Office so they could determine whether he had any injuries and document the blood stains he had on him, Haufler remained willing to cooperate.

*Miranda*; and that there was no evidence that the deputy coroner questioned Haufler at the request of law enforcement rather than to complete the coroner's report.

"Generally, when reviewing a trial court's ruling on a motion to suppress, this Court must accept the trial court's factual findings unless they are clearly erroneous." *Hinkson v. State*, 310 Ga. 388, 400 (5) (b) (850 SE2d 41) (2020) (citation and punctuation omitted). However, where, as here, the statement in question was recorded with both video and audio, which was made part of the record on appeal, and the parties point to no evidence beyond the recording to support their arguments, "we review de novo the trial court's determinations of both fact and law." Id. (citation and punctuation omitted).

On appeal, Haufler argues that the trial court erred in denying the motion to suppress statements he made to Deputy Coroner Bilbo in the presence of Deputy Heath. According to Haufler, although Deputy Heath remained silent while the deputy coroner asked questions, Deputy Heath was a participant in the questioning

through "his presence[ ] and . . . use of [his] patrol car" without advising Haufler of his rights under *Miranda* such that Deputy Coroner Bilbo was in essence acting as a law enforcement officer in questioning Haufler. In response, the State argues that Haufler was not in custody and that government agents not primarily charged with enforcement of the criminal law, such as deputy coroners, are generally under no obligation to comply with *Miranda* before speaking with persons purportedly in custody. See *Daddario v. State*, 307 Ga. 179, 189 (3) (835 SE2d 181) (2019) ("Thus, at least where the official has not been given police powers, *Miranda* has been held inapplicable to questioning by school officials, welfare investigators, medical personnel, judges, prison counselors, and parole or probation officers." (citation and punctuation omitted)). Cf. *In the Interest of T. A. G.*, 292 Ga. App. 48, 51 (1) (a) (663 SE2d 392) (2008) ("Although an officer's mere presence in the room, *without more*, might not constitute police participation," where the evidence showed that the officer was invited to the interview after the juvenile confessed to one robbery and denied another and that the

officer then advised the assistant principal on what charges would be appropriate, "the juvenile court was authorized to find that the officer was more than merely present." (emphasis supplied)).

Pretermitting whether the trial court erred in admitting Haufler's statements to the deputy coroner, any error was harmless beyond a reasonable doubt because the statements were cumulative of similar statements Haufler made before and after his interaction with the deputy coroner. See *Jones v. State*, 314 Ga. 605, 616 (4) (878 SE2d 505) (2022) ("A constitutional error is harmless when the State proves beyond a reasonable doubt that the error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly-admitted evidence or when the evidence against the defendant is overwhelming." (citation and punctuation omitted)). Before Haufler spoke to the deputy coroner, he told Deputy Heath, unprompted, "He's trying to choke me out, and I got the better half of him. And I, I went in to my—I started choking him out, I went and got my gun . . . [a]nd I shot him." Then, after speaking with the deputy coroner, Haufler again, unprompted, told Deputy Heath, "I

22

had a Glock 40 I went and got. This dude's trying to kill me. I'm like pow, pow, pow!" Approximately ten minutes later, Haufler called Deputy Heath back over to the patrol car and told him, "I think it was uh, Marc Dimos that tried to choke me out. . . . I mean, all[ ] I remember is he had me, and I reversed it, and somehow I got the gun, and I shot him." Haufler also stated, "[I]t must have started in the basement, but my gun was upstairs." Haufler later told another officer, unprompted, "Thank God I had a gun in my bedroom." And after Haufler agreed to be taken to the Greene County Sheriff's Department to be interviewed, Haufler again spontaneously stated that he went and got his gun before shooting Dimos.

Thus, because Haufler made similar statements multiple times, both before and after speaking with the deputy coroner,[13] the statements he complains of are cumulative of other evidence that was properly admitted at trial, such that any error in the statements' admission was harmless beyond a reasonable doubt.

---

[13] Haufler has not challenged the admission of these statements on appeal.

Accordingly, this enumeration of error fails. See *Renfro v. State*, 313 Ga. 608, 613-14 (2) (872 SE2d 283) (2022) (even if the trial court erred in admitting the appellant's statements, any error was harmless beyond a reasonable doubt because it was cumulative of other properly admitted evidence).[14]

*Judgment affirmed. All the Justices concur.*

---

[14] In our analysis we have assumed two trial court errors, one instructional and one evidentiary, and determined that each error was harmless. To establish cumulative error, an appellant "must show that at least two errors were committed in the course of the trial, and when considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied him a fundamentally fair trial." *Pritchett v. State*, 314 Ga. 767, 787 (4) (879 SE2d 436) (2022) (citation and punctuation omitted). Here, Haufler has made no argument that we should apply a cumulative error review in this context or how we should aggregate harm from a jury instruction with harm from an unrelated evidentiary decision. See *Jones*, 314 Ga. at 617 (5) n.9 (cautioning that if an appellant seeks a new trial "based on the cumulative effect of errors outside of the evidentiary context, he would do well to explain why cumulative error should be extended beyond the evidentiary context" (citation and punctuation omitted)). However, even assuming that these presumed errors should be considered cumulatively, we conclude that Haufler has "failed to establish that the combined prejudicial effect of these errors requires a new trial." *Park v. State*, 314 Ga. 733, 745 (4) (879 SE2d 400) (2022) (citation and punctuation omitted).

Decided February 21, 2023.

Murder. Greene Superior Court. Before Judge Trammell.

*The Steel Law Firm, Brian Steel; Ross & Pines, Andrew Fleischman; The Aurora Law Firm, Devin A. Rafus*, for appellant.

*T. Wright Barksdale III, District Attorney, Christian B. May, Allison T. Mauldin, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.