NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 2, 2023

S23A0171.  BOLES v. THE STATE.

MCMILLIAN, Justice.

Torres Boles appeals his convictions for felony murder and other charges in connection with the death of his three-year-old daughter, Andraia Boles.[1] He argues on appeal that the evidence

---

[1] Andraia was found dead on February 27, 2013, and on May 23, 2013, a Liberty County grand jury indicted Boles and his wife, Candice Boles, who was Andraia's mother, in connection with the child's death, charging them both with malice murder (Count 1); felony murder based on cruelty to children in the first degree (Count 2); cruelty to children in the first degree (Count 3); cruelty to children in the second degree (Count 4); and contributing to the deprivation of a minor, a misdemeanor (Count 6). Boles also was indicted individually on a second count of cruelty to children in the first degree in connection with an earlier incident involving Andraia (Count 5). He was tried separately before a jury in September 2014 and found guilty of all counts except malice murder (Count 1). Boles was sentenced as follows: Count 2 – life in prison without the possibility of parole; Count 4 – ten years to run consecutively to Count 2; Count 5 – twenty years to run consecutively to Counts 2 and 4; and Count 6 – twelve months to run concurrently with the other sentences. The charge of cruelty to children in the first degree under Count 3 was merged into Count 2 for sentencing purposes. The charges against Candice Boles are not a part of this appeal.

Boles filed a timely motion for new trial on October 8, 2014, which was

was insufficient to support his convictions and that the trial court erred in admitting into evidence statements he made to "Ms. Middleton,"[2] a protective services investigator and case manager with the Georgia Department of Family and Children Services ("DFCS") and to Renee Sylvester, a private-sector counselor hired by DFCS in connection with the agency's investigation into placing Boles's other daughter into foster care.[3] Boles asserts that the two DFCS investigators were acting as agents of law enforcement when they interviewed him and their failure to give him warnings under *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966), renders his statements inadmissible. We conclude that the evidence was sufficient to support Boles's convictions, there was no error in the admission of Boles's statement to Middleton, and any error in

---

amended on June 24, 2020. Boles waived a hearing on the motion, and the trial court issued an order denying the motion on June 17, 2022. Boles appealed that order on July 1, 2022, and the matter was docketed to the term of this Court beginning in December 2022 and submitted for a decision on the briefs.

[2] This witness introduced herself on the stand as "Ms. Middleton," and that is how she is listed and referred to by the trial judge and counsel in the trial transcript.

[3] Middleton and Sylvester are collectively referred to herein as the "DFCS investigators."

the admission of his statement to Sylvester was harmless, as such evidence was cumulative of other, properly admitted evidence. We therefore affirm.

1. The evidence at trial showed the following.[4] In February 2013, Boles and his wife, Candice Boles, lived in Hinesville with their two daughters: D. B., who was four years old, and Andraia, who was three. At 7:56 a.m. on the morning of February 27, 2013, Boles placed a call to 911 to report that Andraia was not breathing and had no pulse.

A first responder, who arrived on the scene a short time later, testified that when she entered the house, she saw Andraia lying on a blanket in the hallway just outside a bathroom. The carpet underneath the blanket was "soaking wet." The child had visible bruising to her face, and her head and eyes were swollen. Andraia was not breathing, had no pulse, and was cold to the touch. The first

---

[4] Because we undertake a harmless-error analysis in Division 3 of this opinion, we review the record in this case "de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Fletcher v. State*, 303 Ga. 43, 47 (II) (810 SE2d 101) (2018) (citation and punctuation omitted).

responder and her partner began CPR, while they waited for an ambulance to transport Andraia to the hospital. A paramedic who arrived with the ambulance testified that he observed "one big bruise" from Andraia's cheekbones to the top of her head and said that he was never able to detect any cardiac activity despite his efforts to revive the child.

The emergency room physician who treated Andraia at the hospital said that when the child arrived, she had obvious trauma, with a lot of swelling and discoloration of the head and face, and no vital signs. She was not moving, appeared lifeless, and had no spontaneous respiration or heart tones. During the physician's examination of the child, he discovered other injuries to her body, including to her buttocks. Andraia's body temperature was 84º, which the physician testified was "incompatible with life," and the child was pronounced dead at 8:30 a.m.

Meanwhile, Boles told Hinesville Police Department officers who had responded to his 911 call that, after he woke up that morning, he put Andraia on the toilet and then got ready for work.

4

He said Andraia was fine when he left the house, but his wife later called him to say that Andraia was not breathing and that he should come home. Boles said that he found his wife with Andraia when he arrived home, and he could not understand what had happened.

At the house, police observed that the carpet was wet from the bathroom into the living room. When an officer asked Boles about the wet carpet, Boles replied that he had cleaned the carpet the night before. The officer said that Boles kept repeating, "[M]y life is over, my life is over." Inside the bathroom, police located blood splatter in the bathtub, and water and blood on the floor. There was a bowl containing crackers and cereal on the back of the toilet and a sippy cup. Blood samples taken from the bathtub, toilet, and bathroom door, and from a man's shoe found at the house were all later determined to be a match for Andraia's blood.

After receiving news that Andraia had died, the lead detective relayed that information to Boles and told him that hospital staff had discovered signs that the child had been abused. Boles admitted that he sometimes gave his children spankings but said that no one

had given Andraia a spanking that morning. Boles agreed to a request from the lead detective to go to the police station, and on the way there, Boles told the lead detective that any scratch marks on Andraia's neck were self-inflicted,[5] and the scab on her bottom was from when they put Vaseline on her skin, along with a diaper, and the skin came off. He said he did not recall what initially caused the scab. The lead detective made audio recordings of his conversations with Boles at the house and in the car, and those recordings were played for the jury.[6]

While the lead detective obtained information from other officers, a different detective stayed with Boles in accordance with Hinesville Police Department policy not to leave visitors alone in the police station. The second detective did not ask Boles any questions, but he testified that Boles was "rambling a little bit" and said that

---

[5] Boles later explained that when Andraia would become upset, she would scratch herself.

[6] Boles challenged the admission of all of his statements to law enforcement at a pre-trial hearing held pursuant to *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964). The trial court ruled that the statements were admissible, and Boles does not raise an issue on appeal regarding the admission of these statements.

6

he had made a mistake, but quickly changed it to "my life is a mistake."

After the lead detective returned, Boles was given a *Miranda* warning and formally interviewed. The audio recording of this interview was played for the jury. Boles told the lead detective that while D. B. attended pre-school and stayed with a neighbor after school until her parents got home from work, three-year-old Andraia was left at home alone during the day with cartoons playing on the television and with crackers, dry cereal, and a sippy cup with Kool-Aid or water. Boles said that he knew it was wrong to leave a child at home alone, but he explained that they could not afford day care for Andraia. Boles would come home at lunch to check on Andraia and clean up any messes she had made, but he did not stay home long or eat while he was there. He then returned in the evening about 5:30 p.m. in time to pick up D. B.

Boles said that on February 26, 2013, the day before he placed the 911 call, he followed his usual routine of waking up at 5:30 a.m. and putting Andraia on the toilet while he got ready for work. After

7

checking on Andraia and waking his wife to tell her where Andraia was, he left for work, where he was required to arrive by 6:15 a.m. Boles came home at around 11:47 a.m. that day to check on Andraia and left again at around 12:15 p.m. to return to work. He did not notice any injuries to Andraia at that time, other than the scratches on her neck.

Boles again left work at 5:00 p.m. that day and returned home in time to pick up D. B. from the neighbor's house. When they entered their house, Boles discovered that Andraia had put extra toilet paper in the toilet, causing it to overflow and flood the bathroom and the carpet just outside the bathroom. He was "ticked" and put Andraia in the bathtub where she could watch him clean up the water. He began to scoop up the water on the bathroom floor and mop up the wet carpet with towels, discarding the scooped water and wringing the towels in the bathtub. He then decided to shampoo the carpet, but the shampooer apparently leaked, soaking the carpet into the living room. Boles initially told the lead detective that he did not physically discipline Andraia that night, but he made her

stay awake until he finished cleaning, sending her to bed at 11:00 p.m. Boles said that the next morning, February 27, he woke up and put Andraia on the toilet before he went to work. His wife called later that day to say Andraia was not breathing, and he returned home. Boles said that he did not know what had happened, but he blamed himself because he guessed that she had slipped and hit her head on the wet floor.

However, Boles changed his story after the lead detective told him that Andraia's injuries were "severe," resulting from multiple impacts to her head and showed him pictures taken at the hospital of the child's body. Although Boles denied striking Andraia, he admitted that he was angry when he saw that she had caused the toilet to overflow. Boles said that he put Andraia in the bathtub and threw the water he scooped up from the floor on her. He also wrung the towels out near her "where she would feel the water." Boles would not let Andraia get out of the bathtub because he wanted her to see how much work it was to clean up the mess. When Andraia tried to get out, he would "smack" her hands away from the edge of

9

the bathtub. He said that "a lot of times," she would slip and fall in the tub, "I guess, because I slapped her hands away." Boles said that when Andraia hit her head on the bathtub, he "didn't care" and "didn't think about how hard she hit the tub or whether she was hurt." He noticed that Andraia's face was swollen, but not as much as in the pictures, and she was slumped against the side of the bathtub, where he left her to spend the night when he went to bed. He also noticed red areas in the bathtub, but assumed the red color came from the dye in Andraia's pajamas.

The next morning, Boles found Andraia still in the bathtub, and she looked "alright" to him. He said her face was swollen "a lot," but she was able to open one eye, and she took a sippy cup from him. Boles said he "felt really bad about the whole thing," and he took off her wet clothes and put dry things on her. He then got ready and told his wife that Andraia was okay and added, "If you see red, it's from the clothes; it's not blood." The last time he saw Andraia before he left for work, she was slumped in the bathtub.

Boles also told the lead detective that the scab on Andraia's

bottom was from a spanking he gave her with a belt months ago, although he said that the spanking did not break the skin. He explained that the scab was still there because he and Candice used petroleum jelly to treat the "sore" resulting from the spanking. They then put her diaper on, and the sore never had the chance to "get air" to help it heal in the intervening months. Boles and his wife did not take Andraia to the doctor for the sore, and, in fact, Andraia had not seen a doctor since August 2011.

Based on this interview and a separate interview with Candice by another detective, the police decided to charge both Boles and Candice at that time with cruelty to children. The police afforded Boles and Candice an opportunity to speak to one another in the detectives' presence before they were transported to jail. That meeting was recorded and played for the jury, but some of the audio was difficult to hear. The lead detective testified that at one point during the meeting, Boles told Candice, "I f***ed up. I did this s**t. I left her in the bathtub."

Boles later gave similar accounts in separate interviews with

11

Sylvester and Middleton at the jail. Boles told Sylvester that he and his wife left Andraia home alone all day, and because she was not potty-trained, the parents agreed to keep her in the bathroom until she was. Boles admitted to each of the DFCS investigators that he became upset and angry when he saw that Andraia had caused the toilet to overflow on February 26, 2013. Boles told them that he put Andraia in the bathtub as he began to mop up the water with towels. When the towels became "sopping" wet, he would wring them out in the bathtub, and Boles told Sylvester that he wrung the towels over Andraia's head.

During this process, Andraia kept trying to get out of the bathtub, but Boles would not let her. When Andraia put her hands on the edge of the bathtub to climb out, Boles knocked her hands out from under her, and she continued to fall and hit her head. He told Sylvester that at one point, he stopped cleaning to make dinner for the children, and he brought a bag of frozen french fries to put on Andraia's face because it was swollen. Boles told Middleton that he put Andraia on the toilet that night before going outside to smoke a

cigarette and did not return to the bathroom before he went to bed. Boles told Sylvester that no one sought medical help for Andraia, and she spent the night in the bathtub. Boles said he checked on Andraia in the morning and then went to work.

Additionally, in his interview with Sylvester, Boles stated that he used corporal punishment on both girls and that the injuries to Andraia's buttocks occurred approximately six months earlier when he used a belt on her, and then applied Vaseline because the area had turned red, which caused the skin to peel off. Boles conceded that the resulting scab had never healed.

The medical examiner who performed Andraia's autopsy testified that he found "56 evidences of recent external injury," some of which had begun to heal, including injuries to the head, face, and buttocks, and 64 healed injuries. The medical examiner also discovered a number of internal injuries, including a hemorrhage over the entire surface of the child's skull, a skull fracture at the back of the head, and a brain bruise on the front of the head. The medical examiner concluded that the cause of death was cranial

cerebral injuries to the skull and brain, due to blunt-force trauma. The medical examiner further testified that Andraia would have been dead at least six to ten hours before her temperature was recorded as 84º at the hospital.

The defense presented evidence from Boles's mother and a family friend that they had not seen anything abnormal or any injuries to Andraia when they had seen the family several months before Andraia's death.[7] A forensic pathologist, who testified as an expert for the defense, said that she agreed with the medical examiner's conclusion as to cause of death and said that the manner of death was homicide. But she disagreed with the time of death. Relying on the body's blood chemistry, she believed that Andraia was "recently dead" and had not been dead "for a prolonged period of time," because the potassium, chloride, and sodium levels in her blood would have been different if she had been dead as long as six to eight hours.

---

[7] However, Candice's mother testified for the State that she had seen bruising on Andraia's face when she visited the family in December 2012.

The State called another expert in forensic pathology in rebuttal. That expert questioned the methodology employed by the defense expert and stated that the body temperature was consistent with a death that had occurred seven hours before Andraia's temperature was taken at the hospital.

Boles argued at trial that his wife, Candice, had inflicted the fatal injuries to Andraia.

2. Boles asserts that the evidence at trial was insufficient to support his convictions under the standard set out in *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). That standard requires that

> [w]hen we consider the sufficiency of the evidence as a matter of federal due process, our review is limited to whether the trial evidence, when viewed in the light most favorable to the verdicts, is sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted.

*Moore v. State*, 311 Ga. 506, 508 (2) (858 SE2d 676) (2021). And although Boles is questioning whether some of the evidence at trial was properly admitted, when this Court reviews the sufficiency of

the evidence, "we consider *all* the evidence admitted at trial, regardless of whether the trial court erred in admitting some of that evidence." *Davenport v. State*, 309 Ga. 385, 397 (4) (b) (846 SE2d 83) (2020) (emphasis in original).[8]

The charge of felony murder in Count 2 of the indictment was based on the crime alleged in Count 3, which charged Boles with cruelty to children in the first degree in that he "did maliciously cause Andraia Boles . . . cruel and excessive physical pain by inflicting blunt force trauma to her head." See OCGA §§ 16-5-1 (c), 16-5-70 (b).[9]

---

[8] Boles further asserts that the trial court "could have (and should have) exercised its discretion as the thirteenth juror" to grant Boles's motion for new trial. See generally OCGA §§ 5-5-20; 5-5-21. It is well settled that a "thirteenth juror" argument is "not properly addressed to this Court as such a decision is one that is solely within the discretion of the trial court." *Smith v. State*, 300 Ga. 532, 534 (1) (796 SE2d 671) (2017). "Therefore, when a defendant appeals the trial court's denial of a motion for new trial, an *appellate* court does not review the merits of the general grounds." *Myers v. State*, 313 Ga. 10, 13 (1) (867 SE2d 134) (2021) (citation and punctuation omitted; emphasis in original). Moreover, the record supports that the trial court exercised its discretion in denying Boles a new trial on the general grounds, so this assertion presents nothing for us to review.

[9] "A person commits the offense of [felony] murder when, in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (c). "Any person commits the offense of cruelty to children in the first degree when such person maliciously causes a

For purposes of the crime of cruelty to children in the first degree,

> malice in the legal sense, imports the absence of all elements of justification or excuse and the presence of an actual intent to cause the particular harm produced, or the wanton and willful doing of an act with an awareness of a plain and strong likelihood that such harm may result. Intention may be manifest by the circumstances connected with the perpetration of the offense. Intent is a question of fact to be determined upon consideration of words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted.

*Vasquez v. State*, 306 Ga. 216, 222 (1) (a) (830 SE2d 143) (2019) (punctuation and citation omitted). See also *Brewton v. State*, 266 Ga. 160, 161 (2) (465 SE2d 668) (1996).

Boles admitted that he was angry when he discovered that Andraia had caused the toilet to overflow and that he knocked Andraia's arms out from under her when she tried to climb out of the bathtub, causing her to hit her head multiple times and leaving her head swollen and bruised. Boles further admitted that as he took

---

child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (b).

17

these actions, he had no concern as to whether Andraia was injured in the process. The medical examiner testified that the injuries to Andraia's head resulted in her death and that Andraia could have been dead at least six to ten hours before her temperature was recorded at the hospital the next day. Boles also admitted that he left the injured child overnight in the bathtub.

This and other evidence at trial was more than sufficient to support Boles's conviction under Count 2. See *Williams v. State*, 312 Ga. 386, 391 (1) (b) (863 SE2d 44) (2021) (evidence sufficient to support conviction for cruelty to children in the first degree by drowning where defendant admitted that he was angry at his son's misbehavior and that he held the child beneath the water in bathtub twice for prolonged periods); *Mann v. State*, 307 Ga. 696, 699 (1) (838 SE2d 305) (2020) (defendant's admissions to causing child's injuries along with medical evidence regarding the cause of death and the severity and timing of the child's injuries were sufficient to support defendant's convictions for murder and child cruelty); *Delacruz v. State*, 280 Ga. 392, 396 (3) (627 SE2d 579) (2006) ("Malice, as an

18

element of the crime of cruelty to children, can be shown by intentionally and unjustifiably delaying necessary medical attention for a child, as that delay may cause the child to suffer from cruel and excessive physical pain." (citation and punctuation omitted)).

Count 4 of the indictment charged Boles with cruelty to children in the second degree in that he and Candice "did with criminal negligence, cause Andraia Boles . . . cruel and excessive mental pain by locking her in a bathroom while they were at work." See OCGA § 16-5-70 (c).[10] Boles admitted to police and Sylvester that he and his wife left Andraia home alone while they were at work, with only the television and cereal, crackers, and liquid in a sippy cup to sustain her. In addition, police found a sippy cup in the bathroom, a bowl with crackers and cereal on the back of the bathroom toilet, and a key to the home's interior doors in the

---

[10] "Any person commits the offense of cruelty to children in the second degree when such person with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (c). "Criminal negligence is an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby." OCGA § 16-2-1 (b).

19

bathroom sink, supporting an inference that Andraia was kept locked in the bathroom during the day. [11] This and other evidence at trial was sufficient to support Boles's conviction under Count 4. See *Kain v. State*, 287 Ga. App. 45, 47-48 (1) (650 SE2d 749) (2007) (evidence sufficient to show criminal negligence constituting cruelty to children in the second degree where woman regularly allowed her small children to roam outside alone and left them home alone, and where the children drowned one day while outside unattended).

Count 5 of the indictment charged Boles with cruelty to children in the first degree in that he "did maliciously cause Andraia Boles . . . cruel and excessive physical pain by spanking her with a belt to the extent that her skin split open." Boles admitted to the lead detective that the injuries to Andraia's buttocks were caused by his spanking her with a belt months before her death, leaving a

---

[11] Although Count 4 specifically alleged that Andraia was confined in the bathroom, some members of this Court question whether that allegation was a material element of the offense charged or mere surplusage. See *Fair v. State*, 284 Ga. 165, 167 (2) (a) (664 SE2d 227) (2008) ("[a]n allegation in an indictment that is wholly unnecessary to constitute the offense[s] charged is mere surplusage."). However, we need not resolve that issue because in this case there was sufficient evidence to support that allegation.

visible sore that he and Candice attempted to treat with Vaseline and that had not healed in the intervening months. This and other evidence at trial was sufficient to support Boles's conviction on Count 5. See *Gibson v. State*, 277 Ga. 486, 487 (1) (591 SE2d 800) (2004) (upholding conviction for cruelty to children where evidence supported a finding that defendant struck his son with a belt with "enough force to possibly leave bruises").

Count 6 charged Boles and Candice with contributing to the deprivation of a minor, a misdemeanor, in that they "did willfully fail to act such that said omission and failure to act resulted in Andraia Boles . . . being a deprived child . . . by leaving the child at home, unsupervised, while they were at work." Boles's conviction on this charge was supported by the same evidence supporting his

conviction on Count 4.[12] See former OCGA § 16-12-1 (b) (3) (2011).[13]

Accordingly, Boles's claim that the evidence at trial was insufficient as a matter of constitutional due process to support his convictions is without merit.

3. Boles further appeals the denial of his motion to suppress the statements he made to the DFCS investigators while he was in custody, asserting that because the DFCS investigators were acting

[12] Although Counts 4 and 5 were based on the same evidence, the crimes do not merge as each crime has at least one distinct element. See *Gomez v. State*, 301 Ga. 445, 468 n.21 (801 SE2d 847) (2017) (second degree cruelty to children and contributing to the deprivation of a minor do not merge because contributing to the deprivation of a minor required proof that the defendant caused a child to be deprived of parental care and child cruelty required proof that the defendant caused a child cruel or excessive physical or mental pain).

[13] When the crime at issue was committed, former OCGA § 16-12-1 (b) (3) provided that the crime of contributing to the delinquency, unruliness, or deprivation of a minor occurred when a person "[w]illfully commits an act or acts or willfully fails to act when such act or omission would cause a minor to be found to be a deprived child as such is defined in Code Section 15-11-2." See 2011 Ga. L. p. 470 § 3, eff. July 1, 2011. The version of OCGA § 15-11-2 (8) (A) in effect at the time of the crime defined a "deprived child" to include a child who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." *In the Interest of M. F.*, 298 Ga. 138, 139 n.1 (780 SE2d 291) (2015) (noting that the Juvenile Code "was substantially revised in 2013," see 2013 Ga. Laws, p. 294, § 1-1, eff. Jan. 1, 2014, and current law "no longer speaks of a 'deprived child,' but instead refers to a 'dependent child'").

as agents of law enforcement when they questioned him, *Miranda* warnings should have been given and that the lack of warnings means that his statements should have been excluded. However, in denying Boles's motion to suppress, the trial court found that the DFCS investigators were not acting as agents of law enforcement and, in any event, the statements Boles gave to them largely provided cumulative evidence of matters already known to law enforcement.

Because the parties do not dispute the circumstances surrounding Boles's statements to the DFCS investigators, our review of the trial court's application of the law to such undisputed facts is de novo. See *Hinkson v. State*, 310 Ga. 388, 399 (5) (a) (850 SE2d 41) (2020). Moreover, we bear in mind that "[t]he State has the burden of proving that evidence challenged in a motion to suppress is admissible." *Awad v. State*, 313 Ga. 99, 102 (2) (868 SE2d 219) (2022).

(a) We start our analysis by setting out first principles. Under the Fifth Amendment of the United States Constitution, no person

"shall be compelled in any criminal case to be a witness against himself." U. S. Const. Amend. V. To protect the right against self-incrimination, the United States Supreme Court in *Miranda*

> formulated procedural safeguards to ensure that the inherently compelling nature of an in-custody interrogation by the police will not undermine the suspect's will to resist and force him to speak "where he would not otherwise do so freely."

*Cook v. State*, 270 Ga. 820, 825 (2) (514 SE2d 657) (1999), quoting *Miranda*, 384 U.S. at 467 (III). Thus, "[t]he coercion proscribed by *Miranda* must be caused by the police." Id. at 826 (2). See also *Miranda*, 384 U.S. at 444 ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."); *Outlaw v. State*, 311 Ga. 396, 403 (3) (b) (858 SE2d 63) (2021) ("It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation." (punctuation omitted), quoting *Illinois v. Perkins*,

24

496 U.S. 292, 297 (II) (110 SCt 2394, 110 LE2d 243) (1990)).[14]

Accordingly, "*Miranda* warnings are not a prerequisite to the admission of statements made by a defendant to persons other than law enforcement officers or their agents." *Bethea v. State*, 251 Ga. 328, 330-31 (7) (304 SE2d 713) (1983) (statements made to defendant's commanding officer admissible in absence of a *Miranda* warning). See also *Daddario v. State*, 307 Ga. 179, 189 (3) (835 SE2d 181) (2019) (*Miranda* not applicable to defendant's statements to a CASA volunteer); *Williams v. State*, 302 Ga. 474, 484 (IV) (c) (807 SE2d 350) (2017) (statements made by defendant in response to questioning by an emergency room nurse not subject to *Miranda*); *Rucker v. State*, 203 Ga. App. 358, 358 (2) (416 SE2d 871) (1992) ("It

---

[14] Because the parties do not dispute the issue, for purposes of analysis, we will assume, without deciding, that Boles was in custody for purposes of *Miranda* at the time of the interviews, and we confine our analysis in this case to the issue of whether the DFCS investigators were acting as agents of law enforcement in interviewing Boles. But see *Outlaw*, 311 Ga. at 403-04 (3) (b) ("'Imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*.' Rather, in determining whether a person is in custody, 'the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'"), quoting *Howes v. Fields*, 565 U.S. 499, 509-11 (III) (A) (132 SCt 1181, 182 LE2d 17) (2012)).

was not incumbent upon the [DFCS] caseworker to advise defendant of his *Miranda* rights because she was not a law enforcement officer.").

(b) In considering whether the DFCS investigators were acting as agents of law enforcement in this case, and thus whether Boles was entitled to warnings under *Miranda* before speaking with them, both the trial court and this Court are required to consider the totality of the circumstances surrounding the interviews. See *Cook*, 270 Ga. at 827 (2) (concluding that the issue of whether a law enforcement parent was acting as a parent or an agent of the state in questioning his or her arrested child "must be resolved on a case-by-case basis, by viewing the totality of the circumstances"); *Ortiz v. State*, 306 Ga. App. 598, 599-600 (703 SE2d 59) (2010) (applying the totality-of-the-circumstances test to determine whether a school administrator acted as an agent of law enforcement). Cf. *Clark v. State*, 315 Ga. 423, 434 (3) (b) (883 SE2d 317) (2023) (applying totality-of-the-circumstances test to juvenile's waiver of *Miranda* rights). And "proper application of a totality-of-the-circumstances

26

test mandates inquiry into *all* the circumstances surrounding the interrogation." *Clark*, 315 Ga. at 434 (3) (b) (citation and punctuation omitted; emphasis in original). In determining whether a trial court properly denied a motion to suppress, "this Court can consider all evidence of record, including that found in pretrial, trial and post-trial proceedings." *George v. State*, 312 Ga. 801, 803 (865 SE2d 127) (2021) (citation and punctuation omitted). See also *Wright v. State*, 294 Ga. 798, 802 (2) (756 SE2d 513) (2014).

(c) Here, Boles's motion to suppress asserted that the DFCS investigators were acting as agents for law enforcement in conducting their interviews with him, based on allegations of meetings and communications they had with law enforcement, both before and after the interviews.[15] Although the parties briefly discussed the motion at a pretrial hearing and submitted post-

---

[15] The motion also contended that Boles's statement to Sylvester was not voluntary because one of the documents he signed before speaking with her stated that the information gathered in the interview was to aid in the reunification process with his daughter. Boles argued that this statement improperly held out a hope of benefit, which rendered his statement involuntary. However, the trial court also expressly denied the motion on this ground at trial, and Boles does not raise the issue on appeal.

hearing briefing, no evidence was presented on the issue before trial.

Before testimony began on the first day of trial and after hearing argument from counsel, the trial court denied the motion to suppress. In explaining that ruling, the trial court stated that, although there was cooperation between the police and DFCS, the DFCS investigators were not acting "at the behest or the request of law enforcement" when they interviewed Boles, because law enforcement "had nothing to do with the questions that are asked or the type information that's gathered."[16] The trial court also noted that by the time the DFCS investigators conducted their interviews, "[l]aw enforcement had already interviewed the defendants, gotten their statements, [and] advised them of their rights." And the trial court concluded that the information provided to DFCS was "almost cumulative" of what law enforcement officers had already discerned and what Boles had already told them. Therefore, the trial court determined that the statements could not be excluded on the ground

---

[16] It is unclear from the record on what basis the trial court made these findings in the absence of a pre-trial evidentiary hearing on the circumstances under which the DFCS investigators interviewed Boles.

28

that the DFCS investigators were acting as law enforcement agents.

In its written order denying Boles's motion for new trial on this ground, the trial court reaffirmed its finding that the DFCS investigators were not acting as agents for law enforcement based on the evidence presented at trial, noting that both investigators testified that they were not performing any investigation on behalf of law enforcement; there was no evidence law enforcement controlled the DFCS interviews in any manner, such as providing specific questions; and law enforcement was not present at either interview. The trial court further noted that Boles signed consent forms before speaking with Sylvester in which he acknowledged that his interview was voluntary and that confidentiality did not apply to any matter that was the subject of a court action. The trial court additionally determined that the statements made to the DFCS investigators were cumulative of other statements Boles made, noting that he told "multiple individuals, including law enforcement, that he was the one who placed Andraia in the bathtub and repeatedly pushed her down into the tub."

(d) We turn now to the question of whether each of the DFCS investigators was acting as an agent of law enforcement when they interviewed Boles.

(i) *Middleton's Interview*: The evidence at trial showed that DFCS took custody of D. B. after Andraia's death and opened an investigation to determine the proper placement for the child. In connection with that investigation, Middleton interviewed Boles on March 7 at the Liberty County Jail where he was being held following his arrest in a waiting area close to the facility's control room, with no law enforcement present. Middleton was not asked by law enforcement to conduct the interview; rather, it was part of DFCS's own investigation. She testified that the purpose of her conversation with Boles was two-fold: (1) to find out his assessment of what had happened and (2) to determine if he had any relatives with whom he wished the child to be placed. No evidence was presented as to any communications between Middleton and law enforcement before or after this interview. Although the State represented in its briefing that Middleton contacted the lead

30

investigator to ask him if it would be "okay" to talk to Boles, no evidence was presented regarding the content of any further conversation between them. In addition, although the State's briefing represented that both DFCS investigators provided the lead detective with copies of their interview summaries and that the detective placed them in his case file "as he believed them to have some evidentiary value," no evidence was presented regarding when or under what circumstances Middleton provided a copy of her interview to law enforcement.

We conclude, based on the totality of the circumstances surrounding Middleton's interview as reflected in the evidence, including any possible admissions to be gleaned from the State's briefing, that no basis exists for determining that Middleton was acting as an agent for law enforcement in interviewing Boles. To the contrary, the uncontradicted evidence shows that Middleton was acting independently in the course of her work for DFCS and that she communicated with the police before the interview only to get permission to conduct that interview. There was no evidence

31

demonstrating that she spoke with any police officer about what had happened to Andraia before interviewing Boles and no evidence showing why or when she provided a copy of her interview summary to the lead detective. Therefore, we see no error in the trial court's decision to admit Boles's statement to Middleton. See *Daddario*, 307 Ga. at 189 (3) ("[W]here the official has not been given police powers, *Miranda* has been held inapplicable to questioning by school officials, welfare investigators, medical personnel, judges, prison counselors, and parole or probation officers." (punctuation omitted)), quoting 2 Wayne R. LaFave et al., Criminal Procedure § 6.10 (c) (4th ed. Nov. 2018 update)); *In re Paul*, 270 Ga. 680, 684 (513 SE2d 219) (1999) (news reporter did not become a state agent simply by questioning a defendant in the jail); *Rucker*, 203 Ga. App. at 358 (2).

(ii) *Sylvester's interview*: The evidence at trial showed that, in connection with its investigation into D. B.'s placement, DFCS hired Sylvester to perform a comprehensive child and family assessment of the Boles family to determine placement options. Sylvester testified that, on March 1, 2013, two days after Boles's interrogation

32

by law enforcement, she met with the lead detective as a part of that assessment to get permission to interview Boles and to get information from him about what had happened at the Boles home.[17] Sylvester then interviewed Boles at the jail. Sylvester testified that the sole purpose of her assessment was to determine D. B.'s history, which required consideration of how the child had been treated and what safety factors would need to be considered in finding her a placement.

Sylvester's interview with Boles took place in a visiting room at the jail, with no law enforcement present. Boles signed a form indicating that his participation in the meeting was voluntary, and he was told that information from the interview could be used in court proceedings and that Sylvester could be required to testify. Boles also signed a Confidentiality Statement, in which he

---

[17] Sylvester also testified that she went to the DFCS office on February 27 to begin her assignment, and a different detective was present when she arrived, but no evidence was presented as to whether she discussed Andraia's case with that detective. Although the motion alleged that she met with the second detective, a DFCS attorney, and Middleton that day, no evidence in the record supports that any such meeting or meetings occurred.

acknowledged that he understood that "[t]he general requirement that counselors keep information confidential does not apply when . . . [i]nformation is made an issue in a court action." Sylvester and Boles then spoke for over three hours.

Sylvester testified that she did not coordinate her investigation with the police but just collected information from them. Moreover, she stated that the purpose of her assessment was not to do a criminal investigation; rather, her purpose "was solely to examine the circumstances related to the child." Nevertheless, Sylvester contacted the lead detective after her interview with Boles because the detective "had asked that if anything relevant to the criminal portion was revealed that I call him." And the State represented in its briefing that Sylvester supplied the lead detective with a copy of her interview summary, which the lead detective considered to have evidentiary value.

The trial court concluded that Sylvester did not act at the request or behest of law enforcement because law enforcement did not control the interview by "providing specific questions to be

asked," law enforcement was not present at the interview, and Boles signed forms acknowledging that the interviews were voluntary. However, the trial court did not acknowledge that Sylvester had requested information about the investigation prior to her interview and that in that conversation, the lead detective requested that she provide him any relevant information (presumably based on what the lead detective had just relayed to Sylvester), and Sylvester did just that.[18] Proper application of the totality-of-the-circumstances test requires consideration of all these circumstances in addressing Sylvester's interview, see *Clark*, 315 Ga. at 434 (3) (b), and the trial court's failure to consider Sylvester's pre-interview agreement to provide information helpful to law enforcement in conducting her interview and in only considering factors that supported its ruling is troubling.

However, even assuming that the trial court erred in denying Boles's motion to suppress the statements to Sylvester, we conclude

---

[18] The trial court was permitted to find Sylvester's testimony on this point not credible, but nothing in the record indicates that the trial court made any such finding in reaching its conclusion.

35

that the admission of that evidence was harmless because the information provided in Boles's statements to Sylvester was largely cumulative of evidence he had already provided in his statements to police and Middleton and evidence gathered from the crime scene that was properly admitted at trial.

"A constitutional error is harmless when the State proves beyond a reasonable doubt that the error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly-admitted evidence or when the evidence against the defendant is overwhelming." *Jones v. State*, 314 Ga. 605, 616 (4) (878 SE2d 505) (2022) (citation and punctuation omitted). The evidence shows that the statement Boles gave to Sylvester, including his admissions regarding the injuries he caused to Andraia and his practice of leaving Andraia home alone all day, was similar to statements Boles made to law enforcement and Middleton, which were admitted at trial. Moreover, the evidence against Boles was strong and did not support his defense that Candice alone caused Andraia's death. In addition to Boles's own admissions of repeatedly

36

knocking Andraia down, the medical examiner testified that Andraia's body temperature at the hospital supported that she could have been dead at least six to ten hours before her temperature was taken, which was consistent with her death having been caused by Boles's conduct and well before the time when Candice was supposed to have found Andraia unresponsive.

Accordingly, even assuming arguendo, that Sylvester could be considered to have acted as an agent for law enforcement in interviewing Boles, the admission of evidence regarding Boles's statement to Sylvester was harmless beyond a reasonable doubt. See *Haufler v. State*, 315 Ga. 712, 721 (2) (884 SE2d 310) (2023) (admission of defendant's non-*Mirandized* statements to deputy coroner in presence of deputy sheriff was harmless beyond a reasonable doubt where defendant made similar statements multiple times, both before and after speaking with the deputy coroner and the other statements were properly admitted at trial); *Renfro v. State*, 313 Ga. 608, 613-14 (2) (872 SE2d 283) (2022) (even if the trial court erred in admitting the appellant's statements, any

error was harmless beyond a reasonable doubt because it was cumulative of other properly admitted evidence).

*Judgment affirmed. All the Justices concur.*