**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN, and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 24, 2023**

# In the Court of Appeals of Georgia

A23A0791. MABALA v. THE STATE.

RICKMAN, Judge.

Following a jury trial, Lea Leonie Mabala was convicted on nine counts of cruelty to children in the first degree, eight of which stemmed from injuries she inflicted upon her infant daughter and one of which stemmed from her failure to seek medical assistance for those injuries. She argues on appeal that the evidence failed to establish that she acted with malice sufficient to support her convictions, and that the trial court erred by failing to merge her convictions for sentencing purposes. We conclude that the evidence of malice was sufficient to support Mabala's convictions, and that six of the nine counts of cruelty to children do not merge; the convictions on those counts are, therefore, affirmed. Nevertheless, because the guilty verdicts on

three of the counts of cruelty to children do merge, we vacate those convictions and remand this case for resentencing in accordance with this opinion.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys a presumption of innocence. We do not weigh the evidence or judge the credibility of the witnesses, but determine only whether the evidence authorized the jury to find the defendant guilty of the crimes beyond a reasonable doubt in accordance with the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LEd2d 560) (1979).

(Citation and punctuation omitted.) *Laster v. State*, 340 Ga. App. 96, 97 (796 SE2d 484) (2017).

So construed, the evidence adduced at trial showed that Mabala and her boyfriend, Austin Nadolski, are the parents of a two-year-old son and the victim, a seven-week-old infant daughter. Mabala, her boyfriend, the children, and Mabala's mother (the childrens' grandmother) lived together in an apartment, and the childrens' caregiver during the day was the best friend of Mabala's sister, who operated an in-home daycare facility.

At around 6:30 a.m. on the day in question, the caregiver arrived at Mabala's apartment, as was their routine, to take Mabala's children into her care. When she arrived, Mabala reported that the victim had "cried all night long" and "had busted

2

blood vessels in her face," and that her boyfriend did not want the children to go with the caregiver that day because he feared that she would call the Department of Family and Children Services ("DFACS"). The caregiver noted that the baby had purple and red "splotchy . . . areas" around her eyes at that time. The same caregiver also cared for Mabala's sister's children and when she left Mabala's and went to the sister's, she asked the sister to look at the victim's face. Concerned about what she was observing, the caregiver also asked her cousin, who had older children, to view the baby's face and inquired as to whether her cousin was familiar with Mabala's claimed "busted blood vessels."

As the morning progressed, the bruising around the victim's eyes began darkening and turning purple, and when the caregiver removed the victim from her car seat, she noticed an additional bruise on the baby's wrist. The caregiver called and reported that finding to Mabala's sister as well.

The caregiver had a pre-planned event to attend at her own child's school that day, so she left the victim and the other children in the care of her husband. While she was at her child's school, her husband called her to report that when changing the victim's diaper, he observed additional bruising on the baby's abdomen and legs. He used his cellular phone to send the caregiver pictures of the additional bruising.

3

The caregiver returned home and took all of the children, including the victim, to Mabala's sister's home. Mabala's sister called the victim's grandmother (her and Mabala's mother) and asked the grandmother to meet them at her house. By that time, in addition to the bruising, the victim's breathing appeared to be labored.

Mabala's sister informed the grandmother that the victim needed to be taken to the hospital, and the grandmother agreed to take her. When Mabala's sister called the grandmother approximately 20 minutes later, however, she learned that the grandmother had actually taken the baby back to Mabala's apartment, ostensibly to get her insurance card. When the sister called back a second time, the grandmother informed her that rather than taking the victim to the hospital, Mabala's boyfriend had made a doctor's appointment for her later that afternoon. Mabala's sister then called 911 to report the victim's injuries. The grandmother would later state that Mabala's boyfriend refused to allow her to take the baby to the hospital.

A patrol officer was the first person to arrive at Mabala's apartment in response to the call. Upon her arrival, Mabala was inside and her boyfriend was sitting in front of the apartment holding the victim, who was wrapped in a blanket. The officer saw bruising on the baby's face and redness in her eyes, and upon taking her and opening

her blanket, also saw bruising on her chest, abdomen, legs, and wrist. The officer called for emergency medical services to respond to the scene.

In addition to an ambulance, an investigator from DFACS arrived to examine the victim. The DFACS investigator took photographs of the baby as she was being treated by the paramedics. While doing so, the DFACS investigator noted that the victim appeared to be in significant pain, "grasping" with each breath. She photographed visible bruising under both of the child's eyes, her wrist, her ribs, her leg, and her ankle. The baby was transported to the local hospital and then transferred to the intensive care unit of Children's Hospital of Atlanta.

Meanwhile, a detective interviewed Mabala, her boyfriend, and the grandmother. Both Mabala's boyfriend and the grandmother stated that they had seen the baby before they went to bed the previous evening and that she did not have any noticeable marks or bruising. They both claimed to have slept undisturbed until the early morning hours.

Mabala stated that the baby had been suffering from acid reflux and constipation and was fussy throughout most of the night. She was up with the crying baby during that time and noticed bruising on the baby's face, but she was not concerned because she believed it resulted from "straining from her constipation" and

"crying so hard." Mabala further stated that she mentioned the baby's bruising to her boyfriend when she woke him around 4:30 a.m. as she left to take the grandmother to work, and mentioned the bruising to the caregiver around 6:30 a.m. when the caregiver arrived to take the children into her care.

At the hospital, the baby was observed to have labored breathing, bruising on both eyelids, bruising on the bridge of her nose, subconjunctival hemorrhages (bleeding on the whites of her eyes), multiple bruises on her abdomen, multiple bruises on her legs, and multiple bruises on her arms. Further examination also revealed that she had a fractured skull, subdural hemorrhaging, a lacerated liver, a fractured scapula, three fractured ribs on one side and one fractured rib on the other, and a fracture on each of her legs. In addition, the baby had several older fractures in her legs that were already in an advanced stage of healing.

A medical expert in child abuse pediatrics determined that the victim's injuries were consistent with "non-accidental trauma or intricate child abuse," and that the injuries were inflicted on at least two separate occasions based on the presence of both very new and already healing fractures. The expert opined the baby would have exhibited signs of pain from the injuries that would have been observable to an adult.

Mabala and her boyfriend were arrested and indicted as parties to a crime on

11 counts of cruelty to children in the first degree; Counts 1 through 8 were premised upon the victim's new, separate and distinct injuries, Count 9 was premised upon their failure to seek medical care for the new injuries, and Counts 10 and 11 were premised upon the older, healing injuries. The boyfriend pled guilty prior to trial and testified against Mabala at trial. The jury convicted her on Counts 1 through 9 and acquitted her on Counts 10 and 11. She argues on appeal that the State failed to prove that she acted with the requisite malice to support her convictions and that those convictions should have otherwise merged for sentencing purposes.

1. Under Georgia law, "[a]ny person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (b). In this context, malice "imports the absence of all elements of justification or excuse and the presence of an actual intent to cause the particular harm produced, or the wanton and willful doing of an act with an awareness of a plain and strong likelihood that such harm may result." (Citation and punctuation omitted.) *Boles v. State*, 316 Ga. 209, 216 (2) (887 SE2d 304) (2023). Malice "can [also] be shown by intentionally and unjustifiably delaying necessary medical attention for a child, as that delay may cause the child to suffer from cruel and excessive physical pain." (Citation and punctuation omitted.)

7

*Vasquez v. State*, 306 Ga. 216, 222 (1) (a) (830 SE2d 143) (2019). "Intention may be manifest by the circumstances connected with the perpetration of the offense." (Citation and punctuation omitted.) *Boles*, 316 Ga. at 216 (2). Whether the accused acted with the requisite intent to commit the crime "is a question of fact to be determined upon consideration of words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted." (Citation and punctuation omitted.) Id.

The evidence showed that after having spent the nighttime hours awake with Mabala, the victim – a non-mobile, seven-week-old baby – had numerous skeletal fractures, including that of her skull, scapula, multiple ribs, and legs; a lacerated organ; and bruising throughout her face and on essentially every quadrant of her body. A medical expert testified that the injuries would have caused the baby to experience pain that would have been visible to Mabala. Rather than seeking medical care, Mabala sent the baby with her caregiver while explaining away the bruising and mentioning a fear of DFACS. After the baby's caregiver and other family members worked together to get her to a hospital, Mabala and her boyfriend impeded their efforts. This evidence was more than sufficient for the jury to conclude that Mabala acted with malice in both causing the victim's injuries and in failing to seek medical

8

care so as to support her convictions of cruelty to children in the first degree. See

*Jones v. State*, 302 Ga. 488, 491 (1) (b) (807 SE2d 344) (2017); *Delacruz v. State*,

280 Ga. 392, 395-396 (3) (627 SE2d 579) (2006).

2. Mabala argues that her convictions should have merged for sentencing

purposes because they involved a single course of conduct against a single victim.

The doctrine of merger generally applies "to situations in which a defendant

is prosecuted for and determined by trial or plea to be guilty of multiple criminal

charges but then, as a matter of substantive double jeopardy law, can be punished –

convicted and sentenced – for only one of those crimes." *Scott v. State*, 306 Ga. 507,

509 (2) (832 SE2d 426) (2019). When the question presented is whether a course of

conduct can result in multiple violations of the same statute, "the merger analysis

requires careful interpretation of the criminal statute at issue to identify the 'unit of

prosecution' — the precise act or conduct that the legislature criminalized." (Citation

and punctuation omitted.) Id. Accordingly, we must begin our analysis with the

statute itself.

As previously discussed, OCGA § 16-5-70 (b) provides that one "commits the

offense of cruelty to children in the first degree when such person maliciously causes

a child under the age of 18 cruel or excessive physical or mental pain." Consequently,

9

"the act prohibited by OCGA § 16-5-70 (b) is maliciously causing a child under the age of 18 cruel or excessive physical or mental pain, and each act causing cruel or excessive physical or mental pain constitutes a 'unit of prosecution' under the statute." (Citations, punctuation, and emphasis omitted.) *Ray v. State*, 359 Ga. App. 637, 642 (3) (859 SE2d 793) (2021).

When examining merger within the context of a course of conduct, "it is also relevant to determine if there has been a deliberate interval of time between the acts of cruelty." (Citation and punctuation omitted.) Id. But "when conducting this analysis[,] that the interval is merely minutes or even seconds cannot be a determinative factor." (Citation and punctuation omitted.) Id.

Mabala was convicted on eight counts of cruelty to children in the first degree, with each count premised upon a specific injury or category of injuries discovered on different areas of the victim's body. The medical expert testified that although there was no way to definitively determine exactly when or how the victim's injuries were inflicted, he knew based on the lack of healing that the injuries could be no more than 10 to 14 days old, and that he could draw the following conclusions with respect to the mechanisms of infliction:

Count 1, skull fracture: likely caused by blunt-force trauma to the skull itself.

Count 2, subdural hemorrhage: an acceleration/deceleration injury likely caused by the head jerking with enough force that the brain moved within the skull and ripped the blood vessels, causing bleeding between the brain and the dura matter.

Count 3, liver laceration: likely caused by impact to the area of the liver with enough force that it transmitted through the liver, causing it to tear.

Count 4, scapula fracture: likely caused by direct impact into the scapula bone.

Count 5, multiple rib fractures: likely caused from a compressive force, such as forcefully squeezing the baby's chest.

Count 6, multiple bruises about the victim's body: bruising above and below the baby's eyes and across the bridge of her nose likely caused by blunt force trauma; bruising on her abdomen likely caused by a slap or forceful grab; bruising on her arms and legs not specifically discussed.

Count 7, left femur fracture: likely caused by the baby's leg being yanked or her limbs flailing while being violently shaken.

Count 8, right proximal tibia fracture: likely caused by the baby's leg being yanked or her limbs flailing while being violently shaken.

11

The medical expert further testified that each of these injuries would have caused the victim visible pain. Finally, and significantly, the expert testified that the baby's injuries overall could not have been the result of a single act:

> [W]e know these were all traumatic injuries. . . . [J]ust looking at the injuries that we see on the outside, they're in different plains of the body. So you have them on the left side of the face, the right side of the face. When we look at the CT scan, there's evidence of impact to the back of the head. Then, there's bruising on the right side of the abdomen and the left side of the abdomen, the left lower leg.
>
> So, there wouldn't be a scenario with a single impact that could cause all these injuries. This has to be multiple impacts . . . .

Based upon the extent of the victim's injuries, the expert's testimony regarding the differing mechanisms likely used to inflict those injuries, and the testimony that the injuries necessarily resulted from multiple impacts, the evidence was sufficient to support a finding that Count 1, the skull fracture; Count 3, the liver laceration; Count 4, the scapula fracture; Count 5, the rib fractures; and Count 7, the left femur fracture were caused by distinct cruel acts separated by deliberate intervals such that those counts do not merge. See *Fossier v. State*, 362 Ga. App. 184, 190-191 (5) (867 SE2d 545) (2021). But we cannot say the same for the remaining counts. There is

12

insufficient evidence from which to conclude that the subdural hemorrhage did not occur at the same time as the skull fracture or the violent shaking that may have caused the leg fractures; therefore, Count 2 should have merged into Count 1 for sentencing purposes. Likewise, we cannot say that the extensive bruising on the baby's body was not inflicted at the same time as the other acts of cruelty; therefore, Count 6 should have also merged. And finally, there is insufficient evidence to conclude that the victim's tibia fracture was inflicted independently from her femur fracture; therefore, Count 8 should have merged into Count 7. See generally *Gomez v. State*, 301 Ga. 445, 456 (4) (c) (801 SE2d 847) (2017) (merging convictions on two counts of cruelty to children – one for causing bruising to the victim's head, torso, and extremities and the other causing hemorrhages of the brain – because there was no evidence of a deliberate interval of time between the acts of cruelty); *Jones*, 302 Ga. at 492 (1) (d) (807 SE2d 344) (2017) (merging appellant's convictions for causing bleeding to the victim's brain and for causing retinal hemorrhages). Mabala's conviction on Count 9, for her failure to seek medical attention, was its own form of cruelty occurring after she inflicted the victim's injuries and did not merge into the remaining counts. See *Avila-Nunez v. State*, 237 Ga. App. 649, 654 (5) (516 SE2d 335) (1999).

In sum, the evidence was sufficient to support Mabala's convictions on each of the crimes for which she was charged and found guilty. Nevertheless, we vacate her convictions as to Counts 2, 6, and 8 and remand this case for resentencing in accordance with this opinion.

*Judgment affirmed in part, vacated in part, and case remanded. Dillard, P. J., and Pipkin, J., concur.*